[S. F. No. 14581. In Bank.—April 18, 1933.]

In the Matter of the Estate of JAMES L. FLOOD, Deceased. Petition of CONSTANCE MAY GAVIN for Partial Distribution. CONSTANCE MAY GAVIN, Appellant, v. THE PROTESTANT EPISCOPAL BISHOP OF CALIFORNIA (a Corporation Sole) et al., Respondents.

Maxwell McNutt, John J. Taaffe and Albert Mansfield for Appellant.

Albert J. Dibblee, Garret W. McEnerney, John J. Barrett, Charles W. Slack, Edgar T. Zook, H. U. Brandenstein, Franklin Swart, Ross & Ross, Andrew F. Burke, D. C. Murphy, John E. Calkins, Jr., and Theodore J. Roche for Respondents.

LANGDON, J.—This is an appeal by petitioner, Constance May Gavin, from a decree of the probate court denying her application for partial distribution. The sole question presented to this court is whether the case should have been submitted to the jury, the court having directed a verdict against petitioner and in favor of respondents. In our opinion, the court erred in so doing, and the judgment must be reversed.

The decedent, James L. Flood, died testate, leaving a surviving widow, Maud Lee Flood, and two children, Mary Emma Stebbins and James Flood. The estate, appraised at $8,565,507.85, was by the terms of his will distributed among said widow and children, Cora Jane Flood, a sister of the decedent, since deceased, and various charitable institutions,

respondents herein. Petitioner alleged that she was the illegitimate daughter of the testator, and claimed a share (2/9) of the estate as a pretermitted heir, under Probate Code, section 90 (formerly sec. 1307 of the Civil Code). Respondents answered, and a trial was had before a jury. At the close of all the evidence, upon motion by respondents, the trial court directed the jury to bring in a verdict against petitioner and in favor of respondents. Judgment was accordingly entered thereon, denying the application for partial distribution. A motion for a new trial was made and denied. Thereupon petitioner brought this appeal from the judgment and order denying the motion for new trial.

Probate Code, section 255, is not involved in this proceeding, petitioner's claim being based upon *legitimation* under section 230 of the Civil Code, which reads as follows: "The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth . . . " To establish her claim of legitimation under this section as construed by a number of decisions of this court, petitioner must sustain the burden of proof of the following elements: (1) *Illegitimacy:* that she is an illegitimate child; (2) *paternity:* that James L. Flood was her father; (3) *public acknowledgment:* that he publicly acknowledged her as his own child during her minority; (4) *reception into the family with wife's consent:* that she was received into his family with his wife's consent, given with knowledge of the illegitimacy; (5) *treatment as legitimate:* that he otherwise treated petitioner as if she were his legitimate child. (See, generally, *Estate of Baird,* 193 Cal. 225 [223 Pac. 974]; *Estate of Gird,* 157 Cal. 534 [108 Pac. 499, 137 Am. St. Rep. 131]; *Estate of Jones,* 166 Cal. 108 [135 Pac. 288].) It is admitted by the pleadings that petitioner is an illegitimate child, the daughter of Eudora Helen Forde Willette, born out of wedlock May 11, 1893, at San Francisco. The evidence is also undisputed that petitioner was received into the family of James L. Flood with the consent of his wife, and lived there for some time during her youth, where she was treated as if she were his legitimate child. The controversy, therefore, cen-

ters about the three remaining elements, paternity, public acknowledgment, and knowledge of Mrs. Flood of petitioner's illegitimacy.

Before proceeding to discuss the evidence, it is necessary to set forth the rule governing the power of the trial court to direct a verdict. This matter has been before the courts of this state on numerous occasions, and the principles were recently reviewed in *Estate of Lances,* 216 Cal. 397 [14 Pac. (2d) 768], wherein this court said (p. 295):

"It has become the established law of this state that the power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit. A nonsuit or a directed verdict may be granted 'only when, *disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence,* the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given'. (*Newson* v. *Hawley,* 205 Cal. 188 [270 Pac. 364]; *Perera* v. *Panama Pacific Int. Exp. Co.,* 179 Cal. 63 [175 Pac. 454]; *Estate of Sharon,* 179 Cal. 447 [177 Pac. 283]; *Estate of Gallo,* 61 Cal. App. 163, 175 [214 Pac. 496]; 24 Cal. Jur., pp. 912–918.) Unless it can be said as a matter of law that, when so considered, no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury. (*Umsted* v. *Scofield Eng. Const. Co.,* 203 Cal. 224, 228 [263 Pac. 799].) A motion for a directed verdict 'is in the nature of a demurrer to the evidence, and is governed by practically the same rules, and concedes as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom . . . Even though a court might be justified in granting a new trial it would not be justified in directing a verdict on the same evidence . . . The power of a court in passing upon such motions is strictly limited. It has no power to weigh the evidence, but is bound to view it in the most favorable light in support of the verdict . . . If, in the opinion of the

court, the evidence is unreliable, it is its duty to grant a new trial, and it may grant such a trial even where there is substantial evidence to sustain the verdict, if it believes that the evidence preponderates against the verdict.' (*Hunt* v. *United Bank & Trust Co. of California*, 210 Cal. 108, 117, 118 [291 Pac. 184, 188].) In other words, the function of the trial court on a motion for a directed verdict is analogous to and practically the same as that of a reviewing court in determining, on appeal, whether there is evidence in the record of sufficient substance to support a verdict. *Although the trial court may weigh the evidence and judge of the credibility of the witnesses on a motion for a new trial, it may not do so on a motion for a directed verdict.*" (Italics ours.)

Two important propositions should be noted in the above quotation. First, the trial court, on a motion by a defendant for a directed verdict, cannot weigh all the evidence introduced by both sides; all evidence in conflict with the plaintiff's evidence must be disregarded. Second, the trial court, in determining such motion, cannot judge the credibility of witnesses, but must give to the plaintiff's evidence all of the value to which it would be legally entitled if the witnesses were believed. If extraordinary situations may be conceived in which these rules would yield to exceptions, the instant case is not one of them, and it must be governed by the rules, which must now be considered as settled in this state by a long line of authorities. (See, also, *Topley* v. *Zeeman*, 216 Cal. 182 [13 Pac. (2d) 666]; *Smellie* v. *Southern Pac. Co.*, 212 Cal. 540, 552 [299 Pac. 529]; *Bannister* v. *Los Angeles Ry. Corp.*, 203 Cal. 427 [264 Pac. 631]; *Estate of Caspar*, 172 Cal. 147 [155 Pac. 631].) Such cases as *Diamond* v. *Weyerhaeuser*, 178 Cal. 540 [174 Pac. 38], where the court found the case for the plaintiff wholly lacking in the elements to justify recovery, and therefore held it proper to direct a verdict, are not inconsistent with these rules. We proceed, then, upon the basis that petitioner was required merely to offer competent evidence of such a substantial nature that it might reasonably be inferred therefrom that she was the illegitimate daughter of James Flood, legitimated in conformity with Civil Code, section 230.

Certain facts constituting the background of this case must be briefly stated. Mrs. Alfredeta Forde, a widow, came to California from Boston with her daughter Eudora Helen Forde (now Eudora Forde Willette), and her son Ferdinand David Forde, in 1891. They lived in Los Angeles until June, 1892. They were in constant financial distress. The mother, a former actress, attempted to support her daughter by giving dramatic readings, and the son, a violinist, occasionally was engaged to play at dances and banquets. Later, the daughter commenced her theatrical career with a stock company. According to her testimony, they met a ''Dr. Victor Sturm'' in Los Angeles, who represented himself to be a retired physician from the east. In June, 1892, Mrs. Forde and Eudora came to San Francisco, Ferdinand following shortly afterward. They stayed at the Russ House, a hotel, for about a month. Eudora testified that Dr. Sturm then arrived, that they became engaged, that she ordered a trousseau for which he was to pay, and that he then disappeared, leaving them with numerous unpaid debts. They moved to the Grosvenor, and then to the Langham hotel, at Ellis and Mason Streets. For a short time, Mrs. Forde was engaged as an actress at the Grove Street theater, on Grove between Polk Street and Van Ness Avenue. The mother and daughter moved from the Langham to a boarding-house, and changed lodgings again several times thereafter.

While living at one of these houses Eudora discovered that she was pregnant. She testified that she consulted a priest concerning her plight, asking whether she might not take the name of a married woman; that he permitted her to do so, telling her that she could treat the matter as a spiritual marriage; that she thereupon took the name of ''Mrs. Stearn'', which, she says, was familiar to her as the name of a department store in Boston. In April, 1893, Mrs. Forde and Eudora rented a room at 628 Eddy Street, and early in May moved next door to a boarding-house at 626 Eddy Street. On May 11, 1893, Eudora gave birth to a daughter. On May 19, 1893, the child was baptized, and a baptismal record made, in which the child's name was entered by the priest as ''Constans Marguerite Stern'', and the parents' as ''Eudora Ford'' and ''Victor Stern''. The

name actually given to the child, petitioner herein, was Constance Marguerite Stearn.

In August, 1893, when the child was about three months old, she was taken into the family home of James L. Flood at 1890 Page Street. He was then thirty-six years of age, had been married to Marie Rose Flood for six years, and had no children. Upon the reception of the child into the Flood family, the financial condition of Mrs. Forde and Eudora improved considerably, many of their bills being paid and large additional sums being given them from time to time. The Floods changed the child's name from ''Constance Marguerite'' to ''Constance May'', and she was known as ''Constance May Flood''. Some time prior to May, 1894, Mrs. Flood acquired a summer home at Alma, Santa Clara County, where she lived with her husband and petitioner during the summer. In August, 1896, she secured a residence at 1816 Pacific Avenue, San Francisco. On January 15, 1898, Mrs. Flood died. Shortly thereafter, on February 23, 1898, James Flood made a trip to the Orient, taking with him his sister-in-law, Maud Lee Fritz, and brother-in-law, Walter Fritz, Constance, and a valet and maid. He returned June 7, 1898. At the conclusion of the trip, Maud and Walter Fritz remained with him at Alma, and their parents, Mr. and Mrs. John Fritz, and their brothers, John and Beaumont Fritz, came out from their home in Kansas City at Mr. Flood's invitation. Mr. Fritz, John and Beaumont spent the summer and part of the fall there, and Mrs. Fritz, Maud and Walter stayed until January 1, 1899, when they went to Kansas City accompanied by Mr. Flood and Constance. It was arranged that Mrs. Fritz was to rear Constance in her home, and Flood thereupon left her and returned to San Francisco. He went back to Kansas City and soon afterwards, and on February 9, 1899, was married to Maud Lee Fritz, sister of his deceased wife. They went to Europe, returned and established their home at Menlo Park, San Mateo County. A child, Mary Emma, was born to them on July 7, 1900. Constance remained in Kansas City with the Fritz family until July, 1901, attending St. Theresa's Academy there for a time.

Some time in July, 1898, Colonel Henry I. Kowalsky, an attorney representing Mrs. Forde and Eudora, sought to

obtain money for them from Mr. Flood. On August 1, 1899, Flood paid to Colonel Kowalsky for Eudora, the sum of $5,000, receiving from him a document entitled "Declaration of Abandonment", which was an affidavit of Eudora Forde, stating that Constance was the child of herself and her husband "Edward Stearn"; that her husband had died in New York in 1894; and that she had abandoned the child and relinquished all claims to its custody and control. Of the $5,000 thereby received for Eudora, Colonel Kowalsky retained $1200 as his fee. The statements in this affidavit respecting parentage were admittedly false, and Eudora testified that she did not know what she was signing. She further testified that Flood knew her under the name of "Miss Dora Forde".

Shortly before July, 1901, Mrs. Forde wrote to Flood on behalf of herself and Eudora, asking that Constance be returned to them. After consultation with his attorney, Mr. Flood had Constance brought to San Francisco. On July 13, 1901, a meeting was held at Mr. Flood's office, at which Flood, according to evidence presented by respondents, offered either to return the child, or to educate her during her minority. The latter arrangement was decided upon, and on July 22, 1901, Constance was taken by her nurse to "Ramona Convent" at Shorb (now Alhambra), Los Angeles County. Flood paid the sum of $7,000 into a trust fund for her expenses for a period of ten years. She remained a boarder in the convent until June, 1911, and was there known as "Constance May Stearn". While there, she became intimate with the two daughters of Senator Robert N. Bulla, frequently spending her week-ends with them. At the conclusion of the ten-year period, she left the convent and went to live at the home of Senator Bulla. He lived in Alhambra with his two children and his sister-in-law, Mrs. Bertha Welfare. Constance made her home there for over nine years, receiving her board and lodging, and a monthly allowance from him of thirty dollars for clothing and incidentals, which was the amount given by him to each of his daughters.

Some time in 1917 petitioner became engaged to be married to John P. Gavin, her present husband, and on April 16, 1917, she wrote to Mr. Flood asking information as to her parentage. Receiving no reply, she wrote again on

May 17, 1917. Thereafter, in June, 1917, James E. Walsh, Mr. Flood's secretary, called at Senator Bulla's home, and told her that according to Mr. Flood's information she was the daughter of Edward Stearn and Eudora Forde Stearn. Upon his return, Walsh sent her, in care of Senator Bulla, an extract from the affidavit of Eudora, to the same effect. After leaving Senator Bulla's home, petitioner was employed for some time as a domestic servant in Los Angeles. On May 11, 1921, when she was twenty-eight years of age, she was married to John P. Gavin at Los Angeles, and has lived there with her husband ever since. On November 30, 1922, being ill and in financial distress, she wrote Mr. Flood, telling of her condition and appealing for aid, but received no reply. In 1918 and 1923, when visiting San Francisco, she attempted to see Mr. Flood, but in each instance was informed that he was out.

James Flood died February 15, 1926. About two months later, petitioner visited in San Francisco, and consulted a firm of attorneys as to her possible right to a share in the estate. Thereafter various investigations and conferences took place, resulting in the commencement of this proceeding.

It is the theory of petitioner that James L. Flood met Eudora Forde soon after she came to San Francisco, had sexual relations with her, that petitioner was the result of the union, and that Flood and Mrs. Flood took her into their home with knowledge of these facts. Respondents advance the theory that Eudora Forde, while accompanying her mother to the Grove Street theater at this time, met James S. Cannon, the property man (who died subsequently in 1911), became intimate with him, and that he was the father of petitioner. According to this theory petitioner was taken into the Flood household as an act of charity by Mrs. Flood, who secured her husband's consent thereto. Both theories find their origin, to some extent, in the statements of Eudora Forde Willette, who from 1926 to 1931 persistently maintained to representatives of petitioner and of respondents, to newspaper men and to others, that Flood was the father, and subsequently testified at the trial that Cannon was the father. As will hereinafter appear, the testimony of this witness is unimportant on this appeal, for at most it creates a conflict with petitioner's case which must

be disregarded in determining the propriety of the court's direction of the verdict. Moreover, it is impeached by prior inconsistent statements and by her conduct to such an extent that the jury might have disbelieved it, and her credibility should have been determined by the proper course of submission of the case to the jury. It was the admitted practice of this witness to maintain herself at the expense of the parties to the litigation. One witness, for example, testified that she told him on one occasion that Aureguy (petitioner's investigator) was behind in his payments, and that she might jump to the other side of the case. She denies making this statement, although the fact is that she did "jump" (because she became conscience-stricken, according to her testimony), and thereafter she received regular remittances from representatives of respondents.

We come now to the case for petitioner, the question being whether the testimony presented by her and all reasonable inferences therefrom, sufficiently establish the elements of legitimation set forth above. Her evidence falls into three classes: (1) Declarations and acts of Mr. Flood; (2) declarations and acts of Mrs. Rose Flood; (3) declarations of others, which the trial court excluded.

Numerous witnesses, including servants, friends, neighbors and casual acquaintances, testified to the conduct and statements of Flood with respect to petitioner. He was greatly attached to the child, played with her constantly, embraced and kissed her frequently and affectionately. Photographs were introduced in evidence, showing the child at the table, or seated with Flood. He provided her with beautiful clothes, toys and trinkets. She was known in the household and among friends as "Baby Flood". She had visiting cards with the name "Constance May Flood" engraved thereon. A flower bed on the Alma estate contained the same name, and various trinkets carried her initials as "C. M. F." Packages and telegrams were received and sent in the name of Constance May Flood. Flood called her "baby", "my daughter", "my little daughter", "my little girl", "my darling daughter"; she called him "papa". He would take the child in his arms and say: "Who does sweetheart look like?" She would answer: "Papa." Their coachman testified that on one occasion, when Flood was in the carriage with the child, he said to her, "Baby, what is papa going

to have when we get up to the ranch?" She replied, "Whisky and soda," and Mr. Flood said, "Baby knows what is good for papa." On his trip to the Orient, petitioner was constantly in his company. To the officers and passengers he made the same sort of declarations as he had made at his home, continually referring to petitioner as his "daughter" or his "little daughter". The passenger lists of the "S. S. Belgic" and the "S. S. Gaelic", on which they traveled, read: "Miss Constance M. Flood," and the captain's manifest of the "S. S. Belgic" read: "Miss C. M. Flood, 5, female, with father, J. L. F." On board the "Gaelic" he met an old friend, who asked him, "Whose child is that?" Flood replied: "It is my own. Doesn't she resemble me?" In Kobe, Japan, he placed the child on the hotel counter saying: "This is my baby, my Constance, my baby Constance May Flood; she can sing in French." Upon the return trip, Flood had printed and published at his expense a newspaper called "Sayonara", recording the events of the trip, and sent copies to all of the officers and passengers. In it was a picture of petitioner as "Miss Constance M. Flood", and the poem: "The Belgic Alphabet", containing the line: "F—is for Flood and his sweet little daughter."

The conduct of Mrs. Rose Flood was equally affectionate. As did the rest of the household, she called the child "baby Flood" or "Sunshine", and was present on many occasions when Flood referred to the child as his "daughter". One of the declarations of Mrs. Flood, which is chiefly relied upon by petitioner, appears in the testimony of Mrs. Adele Gahan, formerly Adele Cerles, nurse in charge of the child at Alma, during the ocean trip, and then at the Pacific Street home. She testified that in July or August, 1897, Mrs. Flood gave her an envelope containing money, and told her to take it to a "Miss Ford" on Mason Street; that she took the child with her to the place, inquired for the woman, and was told by an elderly lady that she was not in, but that she (the elderly lady) was the mother of the woman; that she gave this person the money, and that the lady then tried to coax the child to her, and after some effort said: "Isn't it too bad she doesn't know her grandmother?" Upon her return, the witness testified, she told Mrs. Flood of the incident, and Mrs. Flood said to her: "Adele, I am

going to tell you something, but on your word of honor you must promise that you will never reveal it to anybody. Baby Constance is the daughter of my husband, Mr. Flood, and Miss Ford, and Miss Ford is the mother.''

■ The above evidence constituted the main case for petitioner. No attack was made upon the *admissibility* of this evidence, and the competency of such acts or declarations concerning family history (pedigree) is clearly established by statute and case law in this state. Section 1870, subdivision 4, of the Code of Civil Procedure makes admissible ''the *act or declaration,* verbal or written, of a deceased person in respect to the *relationship,* birth, marriage, or death of any person *related by blood or marriage* to such deceased person . . . '' Section 1852 of the same code provides: ''The *declaration, act,* or omission of a *member of a family* who is a decedent, or out of the jurisdiction, is also admissible as evidence of *common reputation,* in cases where, on questions of pedigree, such reputation is admissible.'' Section 1870, subdivision 11, provides that *''common reputation* existing previous to the controversy'' is admissible in cases of pedigree. Under these sections, the acts and declarations of both Mr. Flood and Mrs. Rose Flood are competent to prove the *paternity* of petitioner. In *Estate of Heaton,* 135 Cal. 385 [67 Pac. 321], a situation similar to that involved herein was presented, and the court said: ''One of the facts absolutely necessary to support the claim of legitimation is that Warren D. Heaton was the father of Jennie. Jennie came to the family of Mrs. Ruth May when but an infant. A few years later Heaton and Mrs. May were married. Thereafter Jennie became a member of the family of Warren D. Heaton and his wife. Being *a member of their family,* the declarations of *either* were competent and relevant evidence upon the question of Jennie's paternity.'' (Italics ours.) (See, also, *Estate of Hartman,* 157 Cal. 206 [107 Pac. 105, 21 Ann. Cas. 1302, 36 L. R. A. (N. S.) 530]; *In re Clark,* 13 Cal. App. 786 [110 Pac. 828]; *Estate of McNamara,* 181 Cal. 82, 100 [183 Pac. 552, 7 A. L. R. 313]; 3 Wigmore, Evidence, sec. 1489, p. 226.)

■ The admissibility of this type of evidence being demonstrated and conceded, respondents' position is simply that the acts and declarations admitted in this case are not sufficient to establish the elements of legitimation, and particu-

larly the element of paternity. Their principal contention is this: The declarations of a married man living with his wife, to the effect that a child in their home is his or their child, import that the child is the *legitimate* child of himself and his wife, and do not afford evidence that the child is the husband's *illegitimate* child. Starting with this proposition, they describe the statements of Mr. Flood as declarations that petitioner was his legitimate child, born in lawful wedlock, and not competent to show that she was his illegitimate daughter. In support of this theory, respondents offer sociological data on the common practice of married persons taking strange children into their homes, and also cite authorities, of which the following is typical: "The rule cannot be stated too broadly, that the description, 'child, son, issue', every word of that species, must be taken *prima facie* to mean legitimate child, son, or issue." (*Wilkinson* v. *Adam*, 1 V. & B. 422, 462, 35 Eng. Rep. 163, 179.) The effect of these authorities would no doubt be that if petitioner were here claiming to be the legitimate child of James Flood, his declarations to the effect that she was *his child* would afford an inference of both *parentage and legitimacy*. ▮ But there is no authority which holds that these declarations mean *legitimacy or nothing*, and common sense would rebel against a notion so unreasonable. The rational view must necessarily be this: Flood's declarations were evidence of paternity, i. e., evidence that he was the father of the person whom he addressed and described as his "child" and his "daughter". In the absence of any other evidence, the inference would normally be that she was his *legitimate child*. But here the undisputed evidence shows, and the pleadings of all parties admit, that Eudora Forde and not Rose Flood was the mother of the child, and it follows that the inference of paternity, if drawn by the jury, would be an inference of illegitimacy and not legitimacy.

Looking at respondents' argument from another point of view, it would wholly prevent the proof of legitimation under Civil Code, section 230, by declarations and acts of a father who was married, for if he referred to the person merely as his *child*, this would not afford proof of illegitimacy, and if he referred to the person as his *illegitimate child*, this would constitute a failure to *treat the child as*

*legitimate*, a positive requirement of the section. Thus, in *Estate of De Laveaga*, 142 Cal. 158, 168 [75 Pac. 790, 794], the court says: "But Jose Maria never received him into his family, or into or among his kindred, and did not treat respondent as if he were a legitimate child, but, on the contrary, *treated him and referred to him as an illegitimate child.*" (Italics ours.) To require reference to the child as .illegitimate would, therefore, prevent legitimation and defeat the very object of the statute. Analogous cases reject such a requirement. In *Blythe* v. *Ayres*, 96 Cal. 532 [31 Pac. 915, 19 L. R. A. 40], speaking of acknowledgment of an illegitimate child for purposes of inheritance, the court says (96 Cal. 589) : "Blythe, in writing, acknowledged himself to be the father of Florence Blythe; Florence Blythe is an illegitimate child; therefore Blythe acknowledged himself to be the father of an illegitimate child. This logic is unassailable and *no sound reason can be adduced why the acknowledgment should contain a declaration of bastardy.*" (See, also, *Estate of Loyd*, 170 Cal. 85 [148 Pac. 522].) We conclude that on the question of paternity the jury should have been permitted to determine the effect of the acts and declarations set forth above.

■ The second disputed issue relates to the element of knowledge by Mrs. Flood that petitioner was the illegitimate child of her husband. The evidence upon which petitioner relies is of two kinds. First are the declarations of James Flood, made *in the presence* of his wife, which, respondents concede, amount to the joint declaration of both spouses, that is, the express declaration of the declarant and the implied declaration of the other spouse who acquiesced therein. (See Code Civ. Proc., sec. 1870, subd. 3; *In re Clark*, 13 Cal. App. 786 [110 Pac. 828] ; *Griswold* v. *Frame*, 48 Cal. App. 178, 183 [191 Pac. 962].) In this connection, section 1963, subdivision 27, of the Code of Civil Procedure is pertinent. It states, as a disputable presumption, that "acquiescence followed from a belief that the thing acquiesced in was conformable to the right or fact". *In re Clark, supra,* deals with this precise question: "As to the third point, the acquiescence of Eliza Clark when introduced on two separate occasions as the *sister* of Jackson Freeman, *is equivalent to an* acknowledgment on her part of said relationship." Re-

spondents attack this evidence on the ground already discussed, namely, that Flood's declarations import *legitimacy,* and hence could not establish knowledge of *illegitimacy* on the part of Mrs. Flood. In other words, their view would seem to be that Mrs. Flood must have understood by her husband's declarations that she was the mother of the child. We have already pointed out the weakness of their premise, and with that eliminated, the evidence is clearly of probative value. Second is the declaration of Mrs. Flood to Adele Cerles (Mrs. Gahan) that Flood was the father and Eudora Forde the mother of petitioner. Respondents launch a determined attack upon this testimony, pointing to alleged inconsistencies, falsehoods and prior statements and conduct of the witness, in an effort to discredit it completely and remove it from consideration as having no value at all. It would be a useless task to set forth the attempted impeachment and rehabilitation of this witness, for it is settled that the question of credibility is one for the jury, and the trial court, as already shown, cannot determine that question on a motion for directed verdict. (*Estate of Lances, supra.*) The point is clearly stated in *Estate of Gird,* 157 Cal. 534, 540 [108 Pac. 499, 502, 137 Am. St. Rep. 131]: "But, says counsel, there are eight separate reasons why Alice Bennett was not 'entitled to full credit', such as swearing to her own adultery, admissions and inconsistent acts. In reply we can only point to section 1847 of the Code of Civil Procedure, which, after declaring the manner in which a witness may be impeached, declares, 'and the jury are the exclusive judges of his credibility'." And in *Brandt* v. *Krogh,* 14 Cal. App. 39, 48 [111 Pac. 275, 279], it is said: "But no one will attempt to challenge the right of a jury or a judge, trying the facts, to believe and credit certain parts of the testimony of a witness who has been shown to have sworn falsely as to certain other material parts thereof." (See, also, *Archibald Estate* v. *Matteson,* 5 Cal. App. 441 [90 Pac. 723].) On this issue, likewise, the matter should have gone to the jury.

The third element of legitimation which respondents claim is lacking is the *public acknowledgment* of the relationship by Flood. This contention is made in spite of the numerous instances in which Flood made declarations of paternity to members of his household, friends, neigh-

bors and complete strangers, in San Francisco, at Alma, on shipboard, in the hotel at Kobe, Japan, and to the world generally in the paper ''Sayonara''. It may be observed that this was not one of the grounds for the motion for directed verdict, and from a study of the court's opinion, appears not to have been a factor in its ruling. On its merits, however, the point deserves scant consideration. Basing their argument on *Estate of Baird,* 193 Cal. 225, 274–278 [223 Pac. 974], respondents assert that there was no public acknowledgment because Flood did not acknowledge the relationship to his mother and his sister. In the cited case, Baird, an unmarried man, made admissions of paternity only in places where he carried on meretricious relations with the mother of the child, and not to the members of his own family (his mother, sister, brother and half-brothers), with whom he was in constant contact. The court said (p. 278) : ''Under the terms of section 230 and such cases as *Estate of Jessup, supra,* [81 Cal. 408 (6 L. R. A. 594, 21 Pac. 976, 22 Pac. 742, 1028)], and *Blythe* v. *Ayres, supra,* it must be held that wilful concealment of the fact of paternity by the father from relatives with whom he is in frequent intercourse and is on terms of affection is opposed to public acknowledgment of paternity.'' The Baird case certainly has no application to the facts disclosed by the record herein. Flood, a married man, maintained a family, consisting of his wife and petitioner, and to this family and to persons who visited and associated with it, he declared the relationship. On the other hand, there is no evidence in the record that Flood's mother or sister visited his home during that period, or that he maintained any close contact with them. The evidence of public acknowledgment falls well within the rules laid down in *Estate of Baird, supra,* and other cases decided by this court. (See *Estate of Gird, supra; Estate of Jones,* 166 Cal. 112 [135 Pac. 288] ; *Estate of Jessup,* 81 Cal. 408 [21 Pac. 976, 22 Pac. 742, 1028, 6 L. R. A. 594].)

From the foregoing brief review, we have concluded that there was competent evidence of sufficient substantiality, in support of the elements of legitimation, to necessitate the submission of the case to the jury. We have, in the course of this review, dealt with those contentions of respondents which bear directly upon the admissi-

bility and probative value of petitioner's evidence. The remaining points of respondents represent an attempt to destroy petitioner's case by argument based on conflicting evidence, and on the absence of direct evidence on certain matters. Parenthetically, it may be said that the principal witnesses for respondents (Eudora Forde Willette, Alfredeta Forde, Walter Fritz and Mrs. Maud Flood) were contradicted in the essential portions of their testimony by evidence of prior inconsistent statements and other contrary evidence, which fact disposes of respondents' contention that the material parts of their case should be considered on this appeal because they are undisputed and not in conflict with petitioner's case. It would greatly and unnecessarily prolong this opinion to give any extended consideration to the lengthy arguments of respondents on these points, but some may be mentioned by way of illustration. Thus, it is said that petitioner offered no direct evidence that Flood ever knew her mother at any time during his life; that she offered no evidence to show that Flood was at any place which would make it possible for him to be her father; that she offered no evidence to show the circumstances under which she was brought to Flood's home, etc. The mere statement of these propositions discloses their weakness, for it is obvious that there is no requirement that petitioner produce *direct* evidence upon any of these points. From the declarations and conduct discussed above, all of the elements of paternity and legitimation can be inferred, and whether the inference should be made is a question for the jury. With respect to the impossibility of Flood being the father of petitioner, counsel lean heavily upon the testimony of Mrs. Maud Flood and Walter Fritz, to the effect that Flood had been in the east and did not return to California in time to be present at the date of probable conception. An examination of the record shows that the discrepancy, based upon the normal period of gestation (280 days), was not more than ten or fifteen days, and that these witnesses were uncertain in their recollection of the dates, basing their statements partly upon memory and partly upon Flood's habits of travel. The result of their testimony in any event was merely another conflict.

We now come to a consideration of the other evidence offered by petitioner and excluded by the court. In view of our conclusion already expressed that sufficient evidence was produced and admitted to require submission of the case to the jury, the admissibility of this remaining evidence is only important in the event that this case is tried anew. This evidence consisted of declarations of relatives of *Mrs. Flood,* namely, Mrs. Nancy Fritz, her mother, Beaumont Fritz, her brother, and Wilhelmina Fritz, her sister, all of whom were either dead or outside the state at the time of this trial. A written offer of proof was made by petitioner, and it was stipulated that a number of witnesses would testify that these parties had all declared upon various occasions that Constance was the daughter of James Flood, but not of Rose Flood, and that the mother of petitioner was a woman. named Stearn; and that petitioner's parentage was a frequent subject of discussion in the Fritz family. A similar offer was made as to the declarations of Walter Fritz made in the presence of other members of the family. To these offers of proof respondents objected, and the court ruled that the testimony was inadmissible. This ruling, in our opinion, was erroneous. The theory of respondents is that pedigree declarations of *Flood* were admissible as to the relationship of petitioner to him; and that declarations of *his blood relations,* or of *his wife* were likewise admissible; but that declarations of *his wife's relatives* were incompetent. *Blackburn* v. *Crawford,* 70 U. S. (3 Wall.) 175 [18 L. Ed. 186], is cited to the point, and it does apparently support this narrow rule; and there is language also in *Shrewsbury Peerage Case,* 7 H. L. D. 1, 11 Eng. Rep. 1, to the same effect. There is no unanimity in the authorities, however, and the view of those cases is not a necessary conclusion from our statute. Section 1870, subdivision 4, makes the pedigree declaration admissible where the deceased declarant was related "by blood or marriage" to the person with whom the declaration deals; and section 1852 makes admissible the declaration of a "member of the family" as evidence of "common reputation" in pedigree cases. There are two theories to justify the admission of these declarations under such statutory provisions. One is that the blood relatives of Mrs. Flood were related to and were

members of the family of Mr. Flood, *connected by marriage* instead of by blood; and that the declarations of such relatives as to *his family history* were admissible. The other is that *petitioner,* who lived for a time in the household of Mrs. Fritz, was a member of *her family* in the broad sense of that term, and the declarations of other members of that family as to *petitioner's family history* were admissible, as evidence of *common reputation* in that family. (See *Estate of Heaton,* 135 Cal. 388 [67 Pac. 321] ; *Alston* v. *Alston,* 114 Iowa, 29 [86 N. W. 55].) We are disposed to give a liberal interpretation to our statutes, and there is authority to support the view which we take. In *People* v. *Fulton Fire Ins. Co.,* 25 Wend. (N. Y.) 205, the court states that "it is the common practice to receive evidence of the declarations of persons connected with the family by marriage as well as those who were connected with it by . . . consanguinity". In *Alston* v. *Alston, supra* [86 N. W. 55, 57], the court admitted declarations of parties not actually related to the alleged father, saying: "With reference to the declarations of Mr. and Mrs. De France, they do not come strictly within the rule requiring such declarations to be by a relative by blood or marriage, but it was *their family in which plaintiff was brought up* and we hold that their declarations are admissible by reason of such relationship." In *Estate of Williams,* 128 Cal. 552, 555 [61 Pac. 670, 672, 79 Am. St. Rep. 67], this court said: " . . . the declarations of William Frederick Williams, deceased, as to the *family understanding and belief,* to the effect that he (George Williams) enlisted in the army, when a boy, . . . and was believed to have been killed, and that he never married, was competent evidence and sufficient to sustain the finding of the court." Professor Wigmore, whose authoritative treatise on evidence is frequently cited by the courts of this state, condemns the doctrine of *Blackburn* v. *Crawford, supra,* and in criticising the distinction drawn by such cases, between relationship by blood and relationship by marriage, states: "All that can be said for such a distinction is that relations by marriage are likely to be less intimate in the family circle and to have little or no interest depending upon a chance of inheritance. But the general likelihood of their being correctly informed is perhaps quite as great as for distant con-

sanguineous relations, and is sufficient in the ordinary instances . . . Furthermore, in general, the declaration of any person connected on one side of a marriage concerning relationship in the family on the other side would probably be received, unless the actual absence of adequate information should be made to appear in a given instance.'' (3 Wigmore, Evidence, 2d ed., p. 226.) In 1 Greenleaf on Evidence, sixteenth edition, section 114c, page 198, it is said that ''the declarations of any person connected by marriage only would probably be received, if he appeared to have had opportunities of information''. And in 3 Jones, Commentaries on Evidence, second edition, section 1132, page 2081, a similar statement is made: ''The declarations of persons connected by marriage are received, since they are more likely to be informed of the family of which they have become members than a relative who is only distantly connected by blood.'' It may be added that the facts of the instant case are extraordinarily appropriate for the application of this rule, since it appears without contradiction that the members of the Flood and Fritz families were very intimately associated, that Mrs. Fritz and her children made lengthy visits at the Flood home, and that Flood made similar visits to the Fritz home at Kansas City.

The possibility of a new trial makes it necessary also to pass upon a ruling of the court which petitioner assigns as error, limiting cross-examination of one of respondents' witnesses. The witness, Mrs. Bertha Welfare, sister-in-law of Senator Bulla, testified on direct examination that she knew petitioner prior to her marriage only under the name of ''Constance May Stearn'' and that all the expenses of maintaining petitioner after she left the convent were met by Senator Bulla and the witness. Petitioner sought to cross-examine the witness to show first, that Flood had paid for the maintenance of petitioner, and second, that the witness knew petitioner as ''Constance May Flood''. She was asked, among other questions, the following: ''Did you ever know Constance by any other name, or did you ever hear any other name mentioned?'' ''Isn't it a fact, Mrs. Welfare, that in 1920, before Constance was married to Mr. Gavin, that Mr. Gavin, in asking you about Constance's parentage in your home, there

being no other person present, said to you, 'Do you know anything about Constance's parentage?' to which you replied, 'Flood—James L. Flood, is her father; I don't know who her mother was . . . '' The court sustained objections to all of this line of questioning, stating that the questions would be permitted only if counsel for petitioner would call Mrs. Welfare as their witness. We are at a loss to understand how this obviously proper impeachment could be restricted in this manner, and in view of the wide latitude habitually permitted by our courts in cross-examination (see *Jackson* v. *Feather River Water Co.*, 14 Cal. 18, 23), and the willingness of the court below to admit the evidence if the witness were called by petitioner, the ruling must be deemed erroneous.

The judgment is reversed.

Curtis, J., Waste, C. J., Thompson, J., Seawell, J., Shenk, J., and Preston, J., concurred.

Rehearing denied.