[Civ. No. 10847. First Appellate District, Division One.—March 4, 1940.]

H. E. MANNING, Appellant, v. CONSTANCE MAY GAVIN, Respondent.

Philip R. McEnerney for Appellant.

Leslie L. Heap and J. Thaddeus Cline for Respondent.

KNIGHT, J.—This is an appeal by plaintiff from an adverse judgment entered in accordance with the verdict of a jury in an action to recover the sum of $24,000 alleged to be due as attorney's fees. Constance May Gavin, her husband John P. Gavin, and Eugene Aureguy were named as parties defendant, but at the opening of the trial appellant dismissed the action as to Mrs. Gavin's husband and Aureguy, and it was tried against Mrs. Gavin alone, with the result that the jury returned a verdict in her favor. The sole ground of appeal is, as it is stated at the beginning of appellant's opening brief, that the trial court included in its charge to the jury several instructions proposed by respondent which "had the effect of directing a verdict in a case where there was a direct conflict in the evidence." In order to determine the question thus presented the challenged instructions must, of course, under well settled rules, be read in connection with the others given, and interpreted in the light of the issues raised by the pleadings and the evidence upon which they purport to have been based; and when that is done, it becomes apparent that the construction appellant would have placed upon them cannot be sustained.

With respect to the pleadings, the record shows that the cause of action sued upon was stated in two counts. In the first it was alleged in substance that Mrs. Gavin claimed to be a daughter and pretermitted heir of James L. Flood, deceased,

and as such was entitled to two-ninths of his estate; that on August 17, 1926, she assigned an undivided one-half interest in her claim to Aureguy; that "between on or about June 17, 1926, and March 1, 1934, at the special instance and request of defendants herein, plaintiff rendered and performed legal services for defendants in the prosecuting of said claim . . . , and in the preparation of said claim for trial, and in counseling and advising said defendants on said claim, and (that) said defendants agreed and promised plaintiff that they would pay him for said services if and when a compromise and settlement of said claim was consummated"; that on or about February 28, 1934, said claim was compromised and settled, and that the reasonable value of his services was $25,000, no part of which had been paid except $1,000. The allegations of the second count were substantially the same as those of the first except that the portions of the first count above quoted and the allegation relating to the compromise and settlement were omitted and in lieu thereof it was alleged that on or about February 28, 1934, said defendants became indebted to plaintiff in the sum of $25,000 for legal services rendered by him at their special instance and request in preparing and prosecuting Mrs. Gavin's claim of heirship, and giving advice with respect thereto, no part of which sum had been paid except $1,000. So far as appears from the record, no answer was filed by Aureguy; but the Gavins filed a joint answer wherein they denied the allegations of the first count above quoted; also those of the second count hereinabove mentioned; and they set out in its entirety the written instrument referred to in the complaint embodying the assignment of the interest to Aureguy; furthermore, by way of special defenses they pleaded payment in full for whatever services appellant claims to have rendered in connection with respondent's claim of heirship, and that the demand sued upon was barred by the statute of limitations.

The important facts shown by the evidence are these: Mrs. Gavin entered into four separate written contracts of employment relating to the establishment of her claim of heirship. The first was made on June 30, 1926, with attorneys Coffey & Coffey, and provided merely for the payment of a contingent fee of thirty-three and a third per cent. Shortly afterwards Coffey & Coffey brought in attorney Geo. K. Ford,

of the firm of Ford, Johnson & Bourquin, as associate counsel, and thereupon a new contract was made with both firms. It was dated July 22, 1926, and besides providing for a contingent fee of thirty-three and a third per cent contained a provision to the effect that the attorneys agreed "to arrange with some other person or persons to investigate and to finance said matters", but that in no event was Mrs. Gavin to pay a total amount in excess of fifty per cent of her interest in said estate—that is, in case it became necessary to pay in excess of sixteen and two-thirds per cent for investigation and financing, said attorneys agreed to reduce the amount of their fees accordingly. As soon as attorney Ford became associated in the case he selected Aureguy (not an attorney) as investigator; but immediately afterwards certain disagreements arose between Aureguy and the Coffeys and the latter withdrew from the case. Upon their retirement the instrument embodying the assignment of interest to Aureguy, referred to in the complaint and set out in the answer, was negotiated by Aureguy and signed by him and Mrs. Gavin. It was dated August 17, 1926, and worded as follows: "Whereas, Constance M. Gavin, of Los Angeles, California, claims that she is an heir at law of James L. Flood, deceased, who left estate in San Mateo County, California, and requires an investigation of said claim and financial assistance in said investigation and the prosecution of said claim; Now, therefore, said Constance M. Gavin hereby employs Eugene Aureguy, of San Francisco, California, to investigate and prosecute said claim and hereby assigns to him an undivided one-half (½) interest in any and all property which may be awarded her by compromise, settlement or judgment in said matter. *Said Eugene Aureguy hereby agrees to investigate said claim and to pay all expenses connected therewith and with the prosecution of said claim, including expenses of attorneys and other matters incidental thereto.*" (Italics ours.) About the time of the execution of said instrument or shortly thereafter, the firm of Ford, Johnson & Bourquin initiated the necessary proceedings to establish Mrs. Gavin's claim of heirship, and thereafter they continued to act as her attorneys and appeared of record as such in all matters connected with said claim until April, 1931, at which time Aureguy, in the exercise of the authority granted by his contract,

informed Mrs. Gavin that he had selected Messrs. John J. Taaffe and Maxwell McNutt to act as her attorneys in the place of Ford, Johnson & Bourquin, and on April 17, 1931, pursuant to Aureguy's instructions, Mrs. Gavin entered into a new agreement with attorneys Taaffe and McNutt which was substantially in the same form as the Aureguy agreement, including an assignment of an undivided one-half interest in her claim to Messrs. Taaffe and McNutt; furthermore, it contained a recital of the cancellation of the Aureguy agreement of August 17, 1926, and appended thereto was a cancellation thereof signed by Aureguy. The Taaffe-McNutt agreement "had the effect", so Mrs. Gavin testified, "of nominally transferring the fifty per cent of Aureguy's into the name of Taaffe and McNutt. Aureguy remained in control of the case as before. The only change being in counsel." Thereafter attorneys Taaffe and McNutt conducted all legal proceedings relating to the prosecution of Mrs. Gavin's claim. The trial took place in Redwood City during the summer of 1931, and resulted in a directed verdict against Mrs. Gavin; but on appeal a reversal was ordered by the Supreme Court (*Estate of Flood*, 217 Cal. 763 [21 Pac. (2d) 579]). The decision was rendered in April, 1933, and on February 28, 1934, Mrs. Gavin's claim was compromised and settled; whereupon one-half of the total she received in said settlement was divided equally between attorneys Taaffe and McNutt on the one side, and Aureguy on the other, and in addition she paid to them out of her half the sum of $12,000, of which Aureguy received $7,000 and attorneys Taaffe and McNutt $5,000.

Appellant was brought into the case by Aureguy in July of 1926. He was at that time a resident of and maintained his principal law office in Vallejo; but he had an office also in the Mills Building in San Francisco next to the offices of the Ford firm and shared a reception room with Aureguy, who was carrying on the business of investigator. Acting under instructions from attorney Ford, Aureguy had already taken charge of the investigations connected with Mrs. Gavin's claim of heirship, and shortly after having done so he introduced appellant to the Gavins, stating to them at the time, so they testified, that appellant was his assistant. They further testified that appellant made the same statement not only then but on several subsequent occasions. After being so

introduced appellant under the direction of Aureguy assisted him in various ways in making many of his investigations. There was very little activity from 1927 to 1930, practically all of the investigation having been carried on in 1926 and from 1930 to the time of trial in 1931; and during those periods appellant, as stated, devoted part of his time aiding Aureguy in his work. Also at various times he talked with Mrs. Gavin about matters under investigation. Usually Aureguy was present; and on a few occasions, under the direction of Aureguy, he accompanied Mrs. Gavin to different places to examine or check records or to interview prospective witnesses. At Aureguy's request also he made one trip east, alone, to obtain certain information. Appellant admitted, however, that he took no part whatever in any of the court proceedings nor in the preparation of any of the pleadings or other court papers relating to the establishment of Mrs. Gavin's claim; that he never appeared as her attorney of record, made any court appearances for her, or participated in the taking of any depositions; and that he was present only once in Redwood City during the trial. But in support of his claim that respondent was liable for the payment of his services, he relied on a conversation which he asserted took place between him and the Gavins in 1926, shortly after he was introduced to them by Aureguy and following a visit he made with them at the direction of Aureguy to the office of Coffey & Coffey to ask for the return of certain articles theretofore left with them by Mrs. Gavin. According to appellant's testimony Mrs. Gavin at that time said to him: '' . . . we (referring to herself and husband) appreciate your interest in our battle, I would like to have you stay with us to protect us and our interests, that no matter what lawyer might handle the case against the Flood Estate, we, my husband and myself, referring to her husband, stay with us and advise us.'' At the conclusion of appellant's testimony respondent moved for a nonsuit and after some discussion the court stated that unless appellant could point out some evidence in the record other than the single conversation above mentioned, he had failed to establish a case, because there was nothing in the conversation as related by him to sustain the allegation in his complaint that ''said defendants agreed and promised that they would pay

him for said services if and when a compromise and settlement of said claim was consummated''. The next morning appellant asked for and obtained permission to reopen his case, and upon taking the witness stand was asked to relate the conversation again, and he answered: '' . . . As I heretofore stated it was around the first or second week of August, 1926, at which time she stated, we, referring to herself and her husband—'appreciate what I had been doing for her, I want you to stay with us in this battle, I want you to protect our interests and no matter what lawyer or lawyers handle the Flood Estate case for us we want you to advise and protect our interest *and if I receive anything from the Flood Estate case of my claim, in that event we will pay you and I will pay you.*' '' (Italic ours.) In response to a question asked on cross-examination appellant stated that ''last night'' was the first time he recalled that part of the conversation above italicized. Thereupon the motion for nonsuit was denied.

Respondent in presenting her case to the jury freely admitted that appellant had assisted Aureguy in the manner above described in carrying on his investigations; but she and her husband positively denied that his services were rendered at their instance or request, or that they promised, directly or indirectly, to pay him for anything he was about to do or had done in that behalf; they also denied ever having solicited or received any legal advice whatever from him, or having received any information from him about the case which had not already been imparted to them by Aureguy; and they specifically denied that the conversation related by appellant ever took place. In addition respondent introduced affirmative evidence which amply supports the conclusion that from the beginning it was understood by appellant as well as by herself and her husband that appellant's services had been invoked by and that he was working for those with whom Mrs. Gavin had entered into written contracts of employment, and that he looked to those parties, and not to her, for the payment of his services out of the fifty per cent share she had assigned to those parties. That appellant had knowledge of the provisions of those contracts is not disputed; in fact he was present at the time the Aureguy contract was negotiated and signed; moreover all expense money required

by him in the pursuance of his investigations was supplied by Aureguy. Part of the evidence introduced by respondent to show that such was appellant's understanding consisted of two conversations, the first of which took place, so the Gavins testified, at their home in Los Angeles shortly after Mrs. Gavin executed the Aureguy agreement of August 17, 1926, assigning to him one-half of her claim. The agreement was obtained, it seems, by Aureguy and signed by Mrs. Gavin in San Francisco in the absence of her husband, and upon her return to Los Angeles she informed her husband what she had done. He was much displeased about the matter, and in response to a letter written by him Aureguy and appellant went to Los Angeles to explain matters. At that time, so the Gavins testified, Aureguy and appellant both assured them that the fifty per cent she had assigned to Aureguy "would cover everything, attorneys fees, investigating and financing"; that appellant in so expressing himself stated, " . . . the fifty per cent will cover everything, me and any other attorneys, or anybody else who might be necessary to carry on, it also covers the financing research work, and all further litigation". The other conversation took place, so they testified, in Los Angeles soon after Mrs. Gavin had settled in full with Messrs. Taaffe and McNutt. With respect thereto the Gavins testified that appellant at the time was paying them a social visit; that just before leaving he complained that inasmuch as Mrs. Gavin, out of the one-half share she had received from the Flood estate, had paid Aureguy an extra $7,000 and attorneys Taaffe and McNutt an extra $5,000, he "should come in for at least $5,000"; that they told him at once that such claim was "outrageous," and that they had no intention of doing anything of the kind; that they knew "and he knew that he was to look to Mr. Aureguy for recompense," but that nevertheless they had intended to give him two or three hundred dollars for his kindness to Mrs. Gavin. Thereupon, so Gavin testified, appellant's attitude became milder and he went on to say that Aureguy was hard pressed for money—that he could not get anything from Aureguy, and that he would appreciate the Gavins doing something for him because he was in need of it. Continuing, Gavin testified that they then wrote appellant a check for a thousand dollars for which he thanked them and in departing said they

would never regret it, and that he would be only too glad to be of assistance to them in the future. There was more conflicting evidence adduced, of lesser importance, but the foregoing would · seem to be quite enough, without going into greater detail, to clarify the points urged by appellant against the instructions, and to prove that they are without substantial merit.

■ The first instruction about which complaint is made (No. 13) was to the effect that appellant had admitted "the genuineness and due execution" of the Aureguy contract of August 17, 1926. The instruction was based · on section 448 of the Code of Civil Procedure, and was clearly applicable in view of the fact that appellant filed no affidavit denying the genuineness and due execution of said contract. But appellant objects to the form of the instruction, contending that since it followed the language of said code section, the jury might have inferred from the use of the words "genuineness and due execution" that it was precluded from considering whether the Aureguy contract was "spurious". The answer to the objection is that at no time did appellant or anyone else claim said contract was spurious. Quite to the contrary, as shown by the affirmative allegations of the fourth paragraph of appellant's complaint relating to the assignment of the interest to Aureguy, appellant took the position from the beginning that it was a *bona fide* contract.

■ The jury was further instructed in substance (No. 27) that if it found that Aureguy was an independent contractor (as that term was defined in the preceding instruction) under agreement with respondent to investigate and prosecute her claim, and as such hired appellant as attorney to perform the services for the payment of which he was then seeking to hold respondent liable, the relationship of attorney and client would not exist between appellant and respondent, and that in the absence of such relationship no recovery could be had against respondent. The point urged by appellant is that a relationship of that kind would exist between Mrs. Gavin and any attorney hired by Aureguy under the authority of his agreement, and that since appellant's action was for the recovery of fees for services arising out of such a relationship the instruction operated to his prejudice. It is evident, however, that when the instruction is read in the light of the

evidence and in connection with other instructions given, the obvious meaning to be gathered therefrom is that if Aureguy as an independent contractor hired appellant and no agreement was made by Mrs. Gavin to pay appellant for his services, no such relationship of attorney and client would exist between appellant and Mrs. Gavin as would render her liable for the payment of appellant's services. In other words, following the dismissal of the action by appellant as to Aureguy, the sole theory upon which he sought to recover against Mrs. Gavin alone was that apart from any hiring by Aureguy Mrs. Gavin made a separate oral contract with him whereby she promised to pay him for his services. In thus stating his position in his opening brief appellant says: "The only issue that remained at the close of the testimony was whether Mrs. Gavin had made the above promise"; and the record shows that in response to that issue the court gave instructions proposed by appellant whereby it was made perfectly plain to the jury that if it believed that Mrs. Gavin did make such promise she was liable for the payment of said services. One of the instructions so given was as follows (No. 39): " . . . if you find from the evidence that the plaintiff has performed for and rendered to the defendant legal services, with her consent, since June 17th, 1926, and that there was an agreement between them either before or after they were performed as to compensation for said services if and when a compromise or settlement of the claim or controversy in connection with which they were rendered or performed was consummated, and that such a compromise and settlement has been consummated, then the plaintiff has the right to recover for such services and you will find for the plaintiff a reasonable value for such services, as shown by the evidence." Another instruction given at appellant's request based upon the same legal doctrine was number 36. Even assuming, therefore, that the legal principle embodied in instruction 27 might have been stated with more clarity, the giving thereof in its present form falls far short of serving as ground for reversal.

Instruction 28 relates to the doctrine of joint venture. Appellant's only comment thereon is that "Joint venture is not defined and the instruction is misleading on the testimony given." No attempt is made to point out wherein the ab-

sence of such definition was harmful or the jury was misled; and where that is not done, no error is shown. ■ The objection made to instruction 29 is that it makes a person's legal liability for services rendered in his behalf dependent upon his knowledge or belief that the person performing the services looks to him for payment. An examination of the record shows, however, that appellant's objection is based entirely upon the last clause of the instruction, and it becomes apparent upon reading the major portion of the instruction that appellant's objection is overcome thereby. ■

The ground of complaint against instruction 31 is that the jury was informed thereby "that a lawyer whose fee is on a contingency basis, cannot recover a judgment against the client". There is no merit in such complaint. As applied to the facts of this case, the instruction was merely to the effect that despite the general rule that the law implies a promise to pay for services rendered, if it clearly appeared. that appellant expressly or impliedly agreed to look for his compensation to the undivided half of the claim of inheritance assigned by Mrs. Gavin to others, he could not recover against Mrs. Gavin. ■ Lastly, appellant takes exception to the concluding four lines of instruction 32. With respect thereto he states that the fact that he performed services at the request of both Aureguy and attorney Ford "would not be a legal bar to a promise made by Mrs. Gavin to pay for such service". Conceding that to be true, there is nothing in the instruction, when read in its entirety, implying a contrary meaning.

After having analyzed the entire charge of the court, which consisted of more than forty separate instructions, we have found nothing therein to warrant the belief that the court interfered in any manner with the right of the jury to consider fully or decide fairly all issues of fact presented by the pleadings and the evidence.

The judgment is therefore affirmed.

Peters, P. J., and Ward, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 2, 1940.