[Crim. No. 71. Fourth Appellate District.—December 15, 1932.]

THE PEOPLE, Respondent, v. CARL F. BURNS, Appellant.

Head, Wellington & Jacobs for Appellant.

U. S. Webb, Attorney-General, and Alberta Belford, Deputy Attorney-General, for Respondent.

BARNARD, P. J.—The defendant was accused of the crime of grand theft in separate counts of an indictment. In the first count it was charged that on or about December 21, 1928, the defendant took from Pauline Weide 35 shares of stock in the Southern California Edison Company of the value of $1,019.38, and $273.96 in cash. In a second count, it was charged that on or about November 30, 1928, the defendant took from Henry Weide and Justine Weide 130 shares of stock in this same corporation, of the value of $3,510. A trial by jury resulted in his conviction, and from the ensuing judgment and from an order denying a motion for a new trial, the defendant has appealed.

It is first contended that the court erred in denying a motion to dismiss the indictment, made under section 1382 of the Penal Code, on the ground that the appellant was not brought to trial within sixty days after indictment found. On the hearing of this motion it was stipulated: That Burns was indicted by the grand jury of Orange County on November 25, 1931, at which time a bench warrant was issued by the superior court of that county; that on that date he was confined in the county jail in Los Angeles County upon a charge of assault with a deadly weapon with intent to commit murder; that immediately after it was issued the bench warrant, together with a hold order, were sent to the authorities of Los Angeles County; that he was confined in the county jail of Los Angeles continuously from the time the bench warrant was issued until January 7, 1932, at which time he was placed in the psychopathic ward of the Los Angeles County General Hospital; that on the following day, January 8, 1932, he was transferred from this psychopathic ward to the Norwalk State Hospital and confined there continuously until April 11, 1932; that on that date he was returned to the Los Angeles County General Hospital; that he remained in custody in Los Angeles until April 22, 1932, at which time he was released on bail; that three days later he appeared in response to the bench warrant above referred to and furnished bond in the sum of $10,000; that on May 10, 1932,

he was surrendered to the Los Angeles County authorities by the bondsmen upon the bond furnished in that county; that he was then confined in the Los Angeles jail until May 27, 1932; and that on May 20, 1932, another bench warrant was issued out of the Superior Court of Orange County and a hold order was placed with the authorities of Los Angeles County. It further appears that the appellant was brought up for arraignment in Orange County on June 3, 1932, at which time the motion to dismiss was made; that the motion was partially heard on that day and continued by the court to June 10, 1932; that on that day the hearing was completed, the motion denied and the time for arraignment continued to June 10th, at the request of the appellant; that he was arraigned on June 10th and the case set for trial on July 6th, and that trial proceeded on July 7, 1932.

The appellant concedes that during the time from January 7, 1932, to April 11, 1932, good cause existed for not bringing him to trial and that this period may be excluded from consideration. It is contended, however, that the fact that he was confined in the Los Angeles County jail upon another charge is not a sufficient showing of good cause for delay during that portion of the time, since it was possible for the prosecution, under section 1567 of the Penal Code, to secure his presence in Orange County for the purpose of trying him upon the charge here involved and that, for this reason, the court's finding that good cause was shown for the delay, is not supported by the evidence.

The general rule applicable here is thus set forth in 8 California Jurisprudence, page 204:

"What is good cause for delay, within the meaning of section 1382 of the Penal Code, may be difficult to define with precision, since it must, in a great measure, be determined by reference to the particular circumstances appearing in each case. The matter rests largely in the discretion of the trial court. However, this discretion is not arbitrary, but should proceed upon such knowledge or information as will enable the court to determine for itself whether public justice requires further detention of the prisoner notwithstanding delay on the part of the prosecution."

As illustrating the varying circumstances which have been held sufficient to excuse such a delay, we may cite the fol-

lowing cases: In *People* v. *Brock,* 87 Cal. App. 601 [262 Pac. 369, 263 Pac. 544], and in *People* v. *O'Connor,* 88 Cal. App. 568 [263 Pac. 866], it was held that good cause had been sufficiently shown where the disqualification of the district attorney had resulted in a loss of time in securing a substitute for him, and where the regular judge was away on assignment by the Judicial Council. In *People* v. *Farrington,* 140 Cal. 656 [74 Pac. 288], a short delay caused by a mistake in a date through an error made by another was held to be a sufficient showing. In a number of cases a showing that the court was during most of the time engaged in the trial of other cases was held sufficient (*Murphy* v. *Superior Court,* 53 Cal. App. 6 [200 Pac. 483]; *People* v. *Vasalo,* 120 Cal. 168 [52 Pac. 305]; *People* v. *Benc,* 130 Cal. 159 [62 Pac. 404]; *People* v. *Clayton,* 89 Cal. App. 405 [264 Pac. 1105]). Unsuccessful efforts on the part of the prosecution to locate the defendant was held a sufficient showing in *Ex parte Gere,* 64 Cal. App. 418 [221 Pac. 689]. In *In re Venable,* 86 Cal. App. 585 [261 Pac. 731], the court stated that it could not be said that the prevalence of an epidemic did not constitute good cause for delaying a trial beyond the sixty-day limit.

■ While no case involving facts exactly similar to those now before us has been called to our attention we think the reasoning underlying the cases we have just cited, and a reasonable interpretation of the statute itself, lead to the conclusion that the trial court did not abuse its discretion in holding that good cause for delay was here shown. Excluding the time the appellant was confined in the Norwalk State Hospital no great delay was shown, and during most of the remaining time he was confined in the Los Angeles County jail awaiting trial and during his trial on a serious charge, of which that county had jurisdiction. The provisions of section 1567 of the Penal Code, relied on by the appellant, have been held to be for the convenience of the court and not for the benefit of persons imprisoned (*People* v. *Willard,* 92 Cal. 482 [28 Pac. 585]; *Willard* v. *Superior Court,* 82 Cal. 456 [22 Pac. 1129]; *People* v. *Meyers,* ■ (Cal.

App.) [300 Pac. 880]). Whether or not the authorities of Orange County possessed the power to demand that the authorities of Los Angeles County turn the appellant over to them for the purpose of trial on the charge here involved before the charge in Los Angeles County was disposed of, it certainly cannot be held that section 1382 requires that such a power be exercised in any event. While this statute provides for the dismissal of a prosecution when a defendant is not brought to trial within sixty days "unless good cause to the contrary is shown", the statute does not pretend to define what will constitute good cause and, necessarily, much is left to the discretion of the court. While such discretion must not be abused nor arbitrarily used, nothing in the statute prevents the use of reason and common sense in determining whether or not good cause appears.

In our opinion, the question as to whether the authorities of Orange County should have attempted to take this prisoner from other authorities already having him in custody, for the purpose of trying him before such other authorities had exhausted their remedy against him, is, to say the least, one resting in the sound discretion of the trial court. No abuse of that discretion appears from any showing here made.

The next point raised is that the evidence is not sufficient to sustain the judgment of conviction. This case was prosecuted upon the theory that the appellant, by means of false representations, obtained the stock and cash referred to in the indictment, for which he gave nothing in return. It is here argued that there is no evidence of any misrepresentation and no evidence that the appellant at the time knew that any representations made were false. It appears from the evidence that one Seamans had 500 shares of stock in the Associated Petroleum Corporation, which purported to be of the par value of $10 per share; that this stock had been sold by Roth & Company of Los Angeles; that Seamans, believing the appellant had formerly worked for Roth & Company, told him that this stock was not what it had been represented to be, and asked him to go to Los Angeles and tell Roth & Company that unless they would take back the stock and pay him $2,000 therefor he would prosecute them for misrepresentation; that Seamans paid the appellant $25 to go and tell this to Roth & Com-

pany; that the appellant phoned Seamans that night informing him that he had done this and that Roth & Company would have a man there the next day; that the next morning a man, representing himself to be Roth, and the appellant came to Seamans in Santa Ana and offered him a check for $2,000; that he refused to accept the check, and a little later they returned and paid him $2,000 in $20 bills; and that he then turned over the stock to Roth & Company. While the appellant in one part of his testimony claims to have been acting for Seamans in selling his stock to the complaining witnesses, in another part of his testimony he stated that he himself paid the $2,000 to Seamans and became the owner of the stock. In any event, it appears that about this same time he approached Mr. and Mrs. Weide, an elderly couple, and their daughter who worked in a laundry, with whom he was acquainted, knowing that they were the owners of certain Southern California Edison Company stock. He represented to them that the Associated Petroleum stock was good; that he would buy it himself if he had the money; that it belonged to Seamans, who needed the money, and for that reason had to sell the same, and that while their Edison stock was only paying six per cent dividends, this other stock would pay eight per cent. As a result of these representations he immediately obtained Edison stock from the elderly couple, which is stipulated to have been worth $3,719, in exchange for 350 shares of this Associated Petroleum stock. He agreed to have this latter stock transferred for the couple and to deliver the new stock at a later date. At the same time he started a deal with the daughter, Pauline Weide, to sell her the remaining 150 shares of Associated Petroleum stock. This transaction was not completed until three weeks later, at which time he agreed to give her 150 shares of Associated Petroleum stock in return for certain Edison stock she held, of the stipulated value of $1,019, together with $273 in cash and an assignment of $200 interest which she had coming from another source. This exchange was procured under the same representations as the other. In each instance the appellant immediately sold the Edison stock received, through a bank, receiving altogether $5,000 in cash. No stock was delivered to the Weides until about April 1, 1929, at which time the appellant delivered to them

a certificate for 175 shares of "Transcontinental Petroleum" stock in lieu of the 350 shares of "Associated Petroleum" stock agreed on, and 75 shares of "Transcontinental Petroleum" stock in lieu of the 150 shares of the "Associated Petroleum" stock. He testified that upon their protest he told them he would investigate this substituted stock; that he went to Los Angeles to see Roth & Company, and that they told him they were reorganizing the company and exchanging one share of Transcontinental Petroleum Company stock for every two shares of Associated Petroleum stock. Later, when he was asked by the Weides about the stock, he told them that he had nothing to do with it since they had bought it and that they must do with it the best they could. The Weides testified that they received no dividends on the stock and that the stock delivered to them was worth nothing. The Transcontinental Petroleum shares were issued as of no par value and it appears that in November, 1928, a corporation commissioner's permit was issued authorizing them to be sold at fifty cents per share. Two experts testified that they had had much experience in buying and selling stocks; that they had investigated Associated Petroleum stock and Transcontinental Petroleum stock and that there was no known market value for either stock in November, 1928, in December, 1928, or in April, 1929, when the stock was delivered. The record contains ample evidence of misrepresentation by the appellant and also of the appellant's knowledge of the untruth of the representations made by him.

The only other point raised is that the court erred in admitting certain testimony as to the value of the stock delivered by the appellant in exchange for the Edison stock and the cash. It is first contended that the court erred in permitting one of the experts to give his opinion as to the market value of the stock, on the ground that his qualification was not sufficiently shown and that he could not have known of all the sales taking place in the United States. The witness was sufficiently qualified and the objection made went only to the weight of his evidence. It is further objected that the court erred in admitting in evidence the permit to sell the "Transcontinental" stock at fifty cents a share. While this evidence in itself may not have been conclusive, under the circumstances shown by

the record it was admissible in evidence. As a matter of fact, it was offered only for the purpose of showing intent on the part of the appellant. As was said in *Peek* v. *Steinberg,* 163 Cal. 127 [124 Pac. 834, 836]:

"Where there is no established market value for shares, the inquiry into the actual or intrinsic value should not be closely restricted. 'This value may depend on many facts and circumstances, such as the value of the property and assets owned, the dividends paid, the character and permanency of the business, the control of the stock, the management, the markets for articles produced if a manufacturing concern, and other facts. The evidence would necessarily take a broad range, and would properly be admissible to prove any fact calculated to affect the value.'"

The then owners of the stock testified that it was of no value, which is itself sufficient to support the implied finding of the jury to that effect. In addition to the testimony above referred to, there are many portions of the evidence which justified the inference that this stock was worthless, and support the verdict of the jury. It may be further observed that the testimony of the appellant himself, with the reasonable inferences therefrom, substantiates every element of the charges necessary to be proved and furnishes further corroboration, if more be needed. If any technical error could be found, a reading of the entire record discloses that no miscarriage of justice has occurred.

The judgment and order appealed from are affirmed.

Marks, J., and Jennings, J., concurred.