[Civ. No. 11357.   First Dist., Div. One.—April 16, 1941.]

H. T. MARTIN et al., Appellants, v. JASPER W. TULLY et al., Respondents.

Courtney L. Moore and Harold E. Haven for Appellants.

Herbert W. Clark, Morrison, Hohfeld, Foerster, Shuman & Clark, Frederick D. Anderson, Donald Y. Lamont, Chickering & Gregory, Boice Gross and Stephen R. Duhring for Respondents.

WARD, J.—This is an appeal by plaintiffs from a judgment of nonsuit in favor of defendants, and from an order denying plaintiffs' motion for a new trial. The complaint which charged fraud on the part of defendants, through the medium of which one of them was successful in purchasing the stock holdings of plaintiffs in that company, was dismissed as to all but two of the defendants, and it was in favor of these that the nonsuit, the subject of this appeal, was granted.

The Reserve Oil and Gas Company, hereinafter called the Reserve, was incorporated in 1932, the plaintiffs acquiring their interests in the corporation by turning over to it certain lands and oil leases in Colusa and Yolo Counties and accepting stock therefor, and the defendants by outright purchase of stock. The properties were nonproducing and the capital originally subscribed was soon exhausted, necessitating further financing of the company by the sale of stock contributed by the stockholders. The money thus turned over to the corporation was considered in part as donations and in part as loans. In addition the corporation borrowed from defendant Tully and others to meet its expenses. There had been some discussion as to further financing, the plaintiffs who were not in a position to contribute claiming that under previous arrangements the money required for such purpose was to be furnished by defendants. Tully and the Lincoln Petroleum Company of which defendant Bering was president and general manager. This discussion led, on August 16th, to Tully suggesting that he might be willing to buy out plaintiffs' interests.

On October 15, 1934, the board of directors of the Reserve consisted of defendants Tully, Bering, Sherman and Turner, also Stanley Pedder, attorney for the company, and the plaintiffs, Tully. being the president. On this date, Bering, who lived in Los Angeles, learned that an oil and gas lease was about to be made to Hall-Baker & Co., Ltd., a Los Angeles firm dealing in oil lands and leases, covering approximately 5,600 acres of land on El Tejon Ranch in Kern County, and he asked to be given an opportunity to deal on part of the land, to which Baker agreed. Bering then telephoned Tully suggesting that the Reserve take over this available interest; that in order to take advantage of the excellent opportunity, however, they would have to work fast. Tully agreed to have the geologist who had done work for the Reserve go into the matter. The next day, October 16th, the plaintiffs called on Tully who definitely offered to purchase plaintiffs' interests in Reserve for $1,000 each and outright interests in certain of the company's properties. The offer was rejected.

On October 17th, Bering, who had come to San Francisco for the purpose, discussed the Hall-Baker deal with Tully, and on the 19th both further discussed the matter with Baker, who had also come north for the purpose. Bering

and Baker returned to Los Angeles and at a meeting they had on October 22d, Baker told Bering that he would have to have a definite answer regarding the Tejon deal. Bering then telephoned Tully advising him of this conversation and Tully agreed to consider the matter further and wire him. His wire of the same date is as follows: "Authorize you to close deal Hall-Baker terms discussed Friday including one-sixth royalty three-fourths acreage one-eighth royalty one-fourth acreage subject Armstrongs final approval when Hall's report is completed." On receipt of the telegram, Bering had the geologist Armstrong write his approval of the geology on the telegram which he then turned over to Baker "as evidence of the deal".

The title to the El Tejon Ranch stood in the name of the Title Insurance & Trust Company which, as trustee under a bond issue, agreed to execute a "master lease" to Hall-Baker. This master lease was to permit subleases to designated parties, and it was in connection with this permissive subleasing that Hall-Baker was to sublease 2,800 acres to Reserve. On October 26th, Tully called Baker over the telephone and discussed with him the proposed master lease, copy of which had in the meantime been received by Tully in San Francisco, Reserve being named therein as one of approximately twenty sublessees. Referring to this telephone conversation, Baker wired Tully on the 27th as follows: "Your careful analysis of the lease and the resultant suggestions made in our telephone conversation of yesterday are sincerely appreciated."

In the meantime, there is evidence that shortly after October 22d, in connection with a discussion on the matter, Baker displayed to Bering a proposed draft of agreement between Hall-Baker and the Reserve as sublessee. With reference to this agreement, in the letter of October 27th, mentioned in the preceding paragraph, Baker advised Tully "There will be some delay in forwarding the proposed agreement between ourselves. . . . I hope to forward the agreement Tuesday."

On October 30th, Tully wrote Baker with regard to the Hall-Baker Reserve contract as follows: "Bob Bering tells me you and he will arrive in San Francisco Thursday with draft of our agreement so I am looking forward to seeing you then." There is evidence that when Baker called at

Tully's office on November 1st, the latter was busy and Baker was turned over to Pedder. In going over the draft of the agreement "between Hall-Baker Co., Ltd., and Reserve Oil and Gas Company", Baker and Pedder had a violent discussion as to one point and upon taking the matter up with Tully he decided with Baker. So that, on that date, both the master lease and the agreement between Hall-Baker and Reserve had been submitted to the parties. From this evidence alone a jury could have found that Tully intended the transaction to be corporate business and not a personal matter.

On October 30th, also, Tully sent the following wire to plaintiffs: "When will you be in San Francisco Stop We have payments to make on Thursday November first." From the evidence it appears that none of the other directors or stockholders were similarly advised. The plaintiffs did not come to San Francisco until November 7th, when they were advised by Tully that he wanted to clear up the situation; that he would have to have other people on the board who could keep up their payments; that he would give them $1,000 apiece for their stock in addition to an outright interest in certain lands belonging to Reserve; that the company being indebted to him would have to acquiesce in such an arrangement; that the Reserve expected to develop in the neighborhood of the lands proposed to be conveyed to plaintiffs and that he [Tully] would take an option to purchase the conveyed lands at $1,000 an acre. No mention was made of the Tejon transaction, although plaintiffs were the only directors at that time ignorant of the negotiations in that regard, and Bering had discussed with Tully the matter of disposing of sufficient of the Tejon lands subleased to Reserve by Hall-Baker to pay for the development work on the balance. Plaintiffs testified that Tully had prepared different agreements for them to sign, but they protested many times that they were very anxious to retain their stock and were not satisfied with his offers; that, so far as contributions necessary for the running expenses of the company were concerned, they still contended the obligation was not theirs.

At a directors' meeting called by Tully on November 16th, he made demands that the principal holdings of the company be turned over to him for the advances of cash made by him; he refused all compromises offered by the plaintiffs; said he

wanted a "clean sweep" and would throw the company into bankruptcy unless his offers were accepted. The plaintiffs still refused his offers until they could talk with their attorney. Following this meeting, plaintiffs talked with defendant Bering, who advised them, in response to their inquiry as to why it was desired to get rid of them as stockholders, that for the good of the company it would be advisable to have men with money in their places; that the company would then develop its lands in the neighborhood of those proposed to be conveyed to plaintiffs so that the Martins would ultimately reap the benefit of such development work of Reserve; that "we have no other deal; there is no other deal".

On November 23, 1934, Tully called another directors' meeting. At this time the master lease between Hall-Baker and the title company, dated November 15, 1934, and in which Reserve was named as one of the permissive sublessees, had been acknowledged by Hall-Baker on the 21st of November and by the title company on November 22d. At the November 23d meeting, at which all the directors were present, and which lasted from 10:00 o'clock in the morning until approximately 5:00 P. M., a gloomy picture of the prospects of the company was presented; the necessity for money was stressed; director Bering stated that Tully had rendered valuable services to the company, which, however, on the suggestion of Pedder, were not being discussed; Tully complained to the gathering that an agreement with plaintiffs which he stated had been arrived at by negotiation on November 7th had not been consummated. The plaintiffs were advised and urged by Tully and other directors to sell, but they made every effort to retain all or at least a portion of their stock, although even at this time they were not cognizant of the Tejon deal. Every compromise offered by the Martins was refused, and finally at the conclusion of the meeting Tully drew up a memorandum between himself and the plaintiffs setting forth terms acceptable to the parties, which memorandum was initialed by the Martins. While the meeting was in progress a note was handed Tully stating that Baker was in an outer office and Tully withdrew from the meeting and delivered to Baker the $15,000 initial payment required in connection with the sublease to Reserve, which amount was advanced half by Tully and half by director Turner.

On November 27th, Baker wrote Pedder, the attorney for Reserve and one of its directors, requesting that the approval of the title report be signed by "Reserve Oil and Gas Company". Pedder testified he did nothing in this connection, however, "because it had not been determined by the Reserve Oil and Gas Company that they would take this property". On this same date Pedder prepared the formal documents consummating the Martin sale of 28,440 shares of stock to Tully; they were not executed, however, until December 1st. And on December 5th, the sublease from Hall-Baker to Reserve was formally executed.

From the above it appears that preliminary drafts of both the master lease and the sublease to Reserve had been prepared prior to October 30th, and that the master lease naming Reserve, not Tully, as one of the permissive sublessees, had been executed prior to the November 23d meeting of the Reserve board of directors, at which time the terms of the sale of the Martin stock to Tully were agreed upon. The sublease from Hall-Baker to Reserve, formally executed on December 5th, had been approved some time before and was identical with its draft of November 15th, except that the provision for the initial payment of $15,000, which was made Baker while the Reserve directors' meeting was in session, was eliminated. It will be apparent from the foregoing that when the Martins sold to Tully, all details in connection with the Tejon deal, contemplating Reserve as a sublessee, had been fully worked out and the papers partly executed.

Appellants contend the question is factual, to wit: "Was there such a lack of evidence of sufficient substantiality as to justify the trial court in granting a motion for a nonsuit," it having been shown that the president of a corporation, assisted by its directors, in various meetings, both private and corporate, deliberately misrepresented to plaintiffs, also stockholders and directors, the condition of the corporation; that they represented the amount offered for plaintiff's stock to be more than its actual value, and so persuaded, induced and misled plaintiffs to sell all of their stock for much less than its actual worth; that information of negotiation and completion of a deal advantageous to the corporation was withheld from plaintiffs, with the result that the president was enabled to purchase their holdings at a nominal price.

Respondents claim the Reserve had no proprietary interest or expectancy in any of the Tejon property on November 23d

when the terms of the purchase of the Martin stock were agreed upon; that the Tejon lease was not in fact the property of Reserve until December 3, 1934; that the Reserve was unable financially to handle the deal, and Hall-Baker was unwilling for such reason to sell to it; that therefore the officers of the corporation were within their rights in making the purchase for themselves; that the deal from its inception was to be handled by Tully for himself as sublessee and that only on account of the importunities of Bering, who, through the Lincoln Petroleum Company was a large holder in Reserve, did he consent after November 23d to transfer the interest to Reserve.

With reference to allegations of the complaint relative to threats of forcing the corporation into bankruptcy, the evidence demonstrates without contradiction that the company was either in or on the verge of insolvency. In a reply to respondents' supplemental brief appellants fairly and frankly state the real question involved on this appeal as follows: "This whole appeal fundamentally narrows itself down to a determination of one question, namely: Was the Tejon deal a corporate transaction or a private deal of Tully's. If it was a corporate transaction, or if there was substantial evidence tending to prove that it was a corporate transaction, then Tully and Bering fraudulently concealed the existence of such a transaction from the Martins, and actively misrepresented to them that there was no such transaction."

On motion for a nonsuit, the truthfulness of a plaintiff's evidence must be assumed, and every reasonable inference drawn therefrom to support his position. The right to a nonsuit is similar to the right to a directed verdict. In *Estate of Flood,* 217 Cal. 763, 768 [21 Pac. (2d) 579], the court said: "A nonsuit or a directed verdict may be granted 'only when, *disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence,* the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given'. (*Newson* v. *Hawley,* 205 Cal. 188 [270 Pac. 364]; *Perera* v. *Panama Pacific Int. Exp. Co.,* 179 Cal. 63 [175 Pac. 454]; *Estate of Sharon,* 179 Cal. 447 [177 Pac. 283]; *Estate of Gallo,* 61 Cal. App. 163, 175 [214 Pac. 496];

24 Cal. Jur., pp. 912–918.)'' ·(*Hall* v. *Barber Door Co.*, 218 Cal. 412 [23 Pac. (2d) 279]; *Estate of Arnold*, 16 Cal. (2d) 573 [107 Pac. (2d) 25].) ▉▉ In determining whether there is evidence that the Tejon deal was in fact a corporate transaction with Reserve, we may examine the evidence in the light of a negative answer to the question—which would of course support the trial court's action in granting the motion for nonsuit—and, as throwing light thereon, consider whether a contrary conclusion is reasonably deducible therefrom or whether such conclusion would be a mere surmise or conjecture. An affirmative answer requires that the evidence presented affords a reasonable inference to that effect rather than one that it was a personal matter of Tully and Turner who made the initial payment. To substantiate the conclusion that it was a corporate transaction, it is only necessary to bear in mind that from its inception and continuously throughout Bering intended and treated it as such. Whatever Tully's original intention may have been, the evidence shows that prior to the time the stock transfer by the Martins to him had been agreed upon, Tully knew that Hall-Baker had prepared the sublease to Reserve; his acts and conduct evidence an acquiescence and approval thereof, and this inference is not dispelled as a matter of law by clear, positive and uncontradicted evidence. It is not intended herein to convey an impression that this court is convinced that there was in fact culpability on the part of respondents Tully and Bering. On motion for nonsuit, neither the trial court nor the appellate court weighs the evidence. The rule is that all evidence in conflict with plaintiff's must be disregarded.

▉▉ Respondents further contend that plaintiffs have failed to establish damages, the difference between the true value of the stock and the amount received by each plaintiff in cash and land, $3,500. To recover, it was incumbent upon plaintiffs to present substantial evidence of the difference between the actual value of the stock parted with and the actual value of that received in exchange. (Civ. Code, sec. 3343.) Ordinarily in an action for damages as the result of fraud in the exchange of property, the method of ascertaining such damages is to present proof of market value. If this is not obtainable, proof may be offered of actual or intrinsic value, which, upon a motion for nonsuit, need not be closely scrutinized if in fact it shows a *prima facie* case of difference

in value from which a reasonable inference may be drawn that a party has been damaged. (*Peek* v. *Steinberg,* 163 Cal. 127 [124 Pac. 834].) If there is no proof of value, the damage has not been proved. The recovery sought in this case is not the stock but the value thereof less payment already received. (*Hahn* v. *Wilde,* 211 Cal. 52 [293 Pac. 30].) Proof of certain circumstances standing alone might not be sufficient to determine value. However, the evidence herein given includes Reserve's fiscal statement dated July, 1934, and the factors making up the price paid for the stock, from which can be determined the approximate value thereof. Based upon this evidence the jury could have reached a conclusion on the value of the stock transferred by the Martins unaffected by the Tejon holding. (*Neher* v. *Hansen,* 12 Cal. App. 370 [107 Pac. 565] ; *Dicker* v. *Italo-American Oil Corp.,* 119 Cal. App. 451 [6 Pac. (2d) 550] ; *People* v. *Burns,* 128 Cal. App. 226 [16 Pac. (2d) 1015].)

The next question is the value of Reserve holdings inclusive of the Tejon property. There is testimony that while no oil was produced on this property, leasehold interests were sold therein to other companies at $100 an acre; that the market value for all purposes as of December 5, 1934, was "about $110 an acre"; that the acquisition cost of the Tejon holding consisted of the initial payment of $25,000, and in addition the cost of drilling two wells approximately $100,000. From this testimony it would appear that the Tejon leasehold increased the net value of Reserve stock by $183,000, or, based upon the issued capital stock of the company of 100,000 shares, $1.83 a share over what the Martins received for their 28,440 shares. Had a jury returned a verdict in favor of plaintiffs upon the foregoing evidence, it could not be said that a finding of damages "would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal or the trial court to set it aside as a matter of law". (*Estate of Flood,* 217 Cal. 763, 768 [21 Pac. (2d) 579].)

The judgment appealed from is reversed.

Peters, P. J., and Knight, J., concurred.

A petition for a rehearing was denied May 16, 1941, and respondents' petition for a hearing by the Supreme Court was denied June 12, 1941.