[Civ. No. 12530.  First Dist., Div. One.  Apr. 17, 1944.]

CORONA MINING COMPANY (a Corporation), Plaintiff and Appellant, v. WILLIAM F. OLDEN et al., Defendants and Appellants.

Treadwell & Laughlin for Plaintiff and Appellant.

Millington, Grover, Comaich & Baumgarten and Herbert Pothier for Defendants and Appellants.

WARD, J.—Plaintiff brought this action to recover from defendants William F. Olden, V. L. Sheridan, Guy Morley and Arthur Sieroty, doing business under the name of Twin Peaks Mining Company, damages for the breach of an agreement existing between them, by the terms of which the defendants undertook to extract and mill ore from certain mineral-bearing lands known as the Corona Mine. The defendants denied the breach, and counterclaimed, alleging that the plaintiff itself had failed to comply with the terms of the agreement in that it had neglected to pay certain royalties to J. T. Flynn in connection with his lease of the Corona Mine, which lease had been assigned to plaintiff in consideration of the payment of such royalties. Defendants further averred that, by reason of the nonpayment of such royalties, Flynn cancelled the sublease, in consequence of which they had been damaged in the sum of $2,469.64, the amount of advances made by them under said agreement which were to be reimbursed to them from net profits to be derived from

the operation of the mine and which were not forthcoming by reason of such cancellation.

It appears from the record that the Corona Mine is a quicksilver mining property of about 88 acres situated in the Oat Hill Mining District in the county of Napa, and owned by Vallejo Quicksilver Mining Company. This company leased the property to T. J. Flynn, reserving certain royalties and also granting an option to purchase for $65,000. Flynn assigned to W. H. Tuggle, Dallas H. Gray and Edward R. Rodgers, reserving a gross royalty of 10 per cent, with a monthly minimum of $200 and an annual minimum of $5,000. Tuggle, Gray and Rodgers assigned to the plaintiff.

Plaintiff operated the mine for about two months after the date of the assignment, March 29, 1941, incurring an indebtedness for a furnace and other improvements placed on the property. It subsequently became unable to meet its payroll and on November 12, 1941, shut down, being at that time entirely without funds. On November 18, 1941, it subleased the Corona property with certain exceptions to defendants, who owned property near by known as Twin Peaks, on which was a mill for treating quicksilver ore. As the construction of this sublease and agreement is one of the principal questions to be decided on this appeal we quote it practically in its entirety:

"THIS AGREEMENT, made this 18th day of November, 1941 by and between CORONA MINING COMPANY, a California Corporation, having its principal place of business at and in the City and County of San Francisco, California, sublessor, and hereinafter referred to as FIRST PARTY, and WILLIAM F. OLDEN, V. L. SHERIDAN, GUY MORLEY and ARTHUR SIEROTY, co-partners all of the State of Califorina, doing business under fictitious name and style of TWIN PEAKS MINING COMPANY, having its principal place of business at and in the City and County of San Francisco, California, sublessee, hereinafter referred to as SECOND PARTIES.

I.

"In consideration of the payments and covenants and agreements hereinafter mentioned the FIRST PARTY does by these presents sublease to the SECOND PARTIES, for the term hereinafter specified, the following described mining claims and real property situated in Oat Hill Mining

District, Napa County, California, more particularly described as follows; to-wit: ...

## II.

"Subject, to the terms, covenants and agreements of that certain lease, pertaining to the within described property, heretofore executed by and between The Vallejo Quicksilver Mining Company, a corporation, lessor and T. J. Flynn, of San Mateo, California, lessee, on the 6th day of November, 1940;

## III.

"And subject to the terms and conditions of that certain assignment of Option to Purchase the within described property, executed on the 29th day of March, 1941, by and between T. J. Flynn, therein designated as assignor and W. H. Tuggle, Dallas H. Gray and Edward R. Rodgers, therein designated as assignee.

## IV.

"And subject to the terms and conditions of that certain assignment of Option to Purchase the within described mining property, executed on the 19th day of April, 1941 by and between W. H. Tuggle, Dallas H. Gray and Edward R. Rodgers, therein designated as assignors and the CORONA MINING COMPANY, a California Corporation, therein designated as assignee.

## V.

"To have and to hold unto the SECOND PARTIES for the term, with all the rights and powers conferred by and coextensive with that certain lease and assignments referred to in Paragraphs II, III, IV of this agreement.

## VI.

"The PARTIES hereto further covenant and agree:

## A.

"That SECOND PARTIES shall endeavor to produce an average of thirty (30) tons of ore per day on said premises and shall employ the customary number of men and supply the customary equipment, materials and supplies to produce said quantity of ore.

## B.

"That SECOND PARTIES shall mill seven hundred fifty (750) tons of ore from said premises per month, subject however, to breakdown of equipment, inability to obtain supplies

necessary for operation, strike, destruction of equipment, act of God or inability to operate for any cause whatever for which the SECOND PARTIES may not be responsible. . . .

### D.

"That SECOND PARTIES shall exclusively manage and control all operations and developments of SECOND PARTIES on said premises and receive an allowance therefor in the sum of TWO HUNDRED ($200.00) DOLLARS PER month, to be charged as operating expenses.

### E.

"That SECOND PARTIES shall operate and develop said mine; produce the ore therefrom and mill the same on its own premises and in its own furnace and the mining operations shall be carried on in an efficient and workmanlike manner.

### F.

"That all necessary mining, operating, development and milling expenses incurred by SECOND PARTIES only shall be charged against the gross proceeds of sale of minerals of any kind, including quicksilver produced from said premises, and upon charging the same, the net proceeds shall be divided equally between the parties hereto.

### G.

"That expenses incurred for repairs to furnace on SECOND PARTIES land and all equipment used for or incidental to production shall be charged against gross proceeds in proportion to the use made of furnace and equipment on ore produced from within described premises and the use of furnace and equipment in production from the SECOND PARTIES own mining premises.

### H.

"SECOND PARTIES shall be allowed the customary depreciation on all equipment used in said operations, except furnace, in the same proportion as in last paragraph mentioned.

### I.

"Royalties provided in the lease and assignments referred to and described in Paragraphs II, III, IV, shall be charged as operating expenses, and any operations carried on by

FIRST PARTY, royalties shall be paid direct by FIRST PARTY on its own gross production.

### J.

"That FIRST PARTY shall faithfully and promptly pay said royalties to the parties entitled thereto immediately upon receipts thereof from SECOND PARTIES and immediately thereafter produce to SECOND PARTIES evidence of payment.

### K.

"That FIRST PARTY upon payment of all sums in said lease provided and any sums due T. J. Flynn, as provided in said option to purchase, shall take title to within premises in its name at such time and Second Parties' name, in equal shares, provided this agreement is in full force and effect.

### L.

"That SECOND PARTIES shall have and keep accurate and detailed accounts and records of all transactions pertaining to this venture and shall have them available to FIRST PARTY at all reasonable times.

### M.

"SECOND PARTIES shall render a full and complete account of all transactions pertaining to the within on or before the 10th day of each consecutive month commencing January 1st, 1942, covering the preceding calendar month or until the last prior accounting and any losses incurred in any accounting period may be charged against operating expenses in the succeeding accounting period or periods until SECOND PARTIES have been reimbursed for such loss.

### N.

"FIRST PARTY shall have right at all reasonable times to visit and inspect said premises and the premises of SECOND PARTIES where furnace is located to determine the progress of operations.

### O.

"SECOND PARTIES shall sell mineral production at prices in line with current market.

### P.

"That SECOND PARTIES shall not permit any lien of

any kind to be created or levied against the within premises by reason of any act or default on its part only.

**R.**

"That FIRST PARTY only shall be liable for each and all outstanding and unpaid obligations incurred by it or with its consent prior to execution hereof, except as herein expressly recognized by SECOND PARTIES.

**S.**

"That, if to protect its investment, SECOND PARTIES should pay any obligation not herein expressly assumed, the amount so paid shall be changed [charged] against any net proceeds due or to become due FIRST PARTY.

**T.**

"That either of the parties hereto shall have and are hereby granted the right to cancel the within lease and agreement upon thirty (30) days notice by registered mail of such intention except that the right of cancellation shall be terminated if not exercised on or before the 1st day of November, 1944.

**U.**

"That SECOND PARTIES shall advance FIRST PARTY FIFTEEN HUNDRED ($1500.00) DOLLARS on execution of this agreement to be repaid by FIRST PARTY at rate of ten per cent (10%) of its net from operation under this agreement beginning February 10, 1942.

**V.**

"The FIRST PARTY hereby warrants that it is not in default of any of the provisions or terms of the lease and assignments referred to in Paragraphs II, III, IV herein. . . ."

At the time of entering into this agreement the plaintiff had paid the royalties reserved except $200 due November 1, 1941, and this it paid on November 19, 1941, from money advanced to it by the defendants under the provision of subdivision U of the agreement; the defendants knew that the plaintiff was without funds to pay further royalties, and the money so advanced was used principally to discharge the payroll obligations of the plaintiff.

While the plaintiff retained certain portions of the Corona property all quicksilver thereafter produced, on which royalties became payable, was produced from that portion of the

property leased to defendants, and no quicksilver was produced on the portion retained by the plaintiff.

The record further shows that the defendants did not produce an average of 30 tons of ore per day, and did not mill 750 tons per month, but milled only 130 tons in three months; nor did they pay or deliver to plaintiff the royalties required by the Flynn lease. The defendants were notified by plaintiff that it had no money to pay the royalties and that unless they were paid by the defendants the lease would be cancelled. Payment of the royalties not being made Flynn cancelled the lease. It was further shown, in support of an averment in the complaint to that effect, that defendants knew that plaintiff had no means, and entered into the agreement so that the royalties would be paid and the lease preserved, and that the loss of the lease was a damage within the contemplation of the parties.

The cause was tried before a jury, and at the conclusion of the evidence the court directed a verdict for the defendants on plaintiff's cause of action, and a verdict for the plaintiff on defendants' counterclaim. In ruling the trial court stated the grounds of its decision as follows: "The case is ended. The Court, of course, is called upon to determine the issues of law involved in the case, and among the questions of law involved is the question of the interpretation of this so-called contract between the Corona and the Twin Peaks. In one of the clauses of the agreement is a certain provision concerning the question of the payment of this royalty. And the Court finds that Twin Peaks—I am not finding this as a matter of infringing on your province, but as a matter of law— that there is nothing in the contract that creates a covenant on behalf of the Twin Peaks to pay this royalty; but all the contract provides is that when the royalty is paid, it shall be paid—shall be charged to operating expenses, which means that out of the division of net profits, if there is any, then the so-called royalty is to be reflected in the nature of costs. So, in the opinion of the Court, there cannot be found any interpretation from the entire contract amounting to a covenant on the part of the Twin Peaks to pay that amount, or to do anything other than as I have stated.

"Now, as to the cross-complaint, that was paid during the time that both parties were in operation under the agreement, and the other $900 went into the property which is now in

the hands of the Twin Peaks in order to prevent liens, and they now having the property, there will be no recovery on that.''

Plaintiff and defendants have both appealed.

■ Upon the theory that it was plaintiff's duty to pay the royalties, defendants sought recovery by cross-complaint, contending that its failure to pay them constituted a breach of the contract. An examination of the contract discloses no assumption by the Twin Peaks Mining Company to pay such royalties. In the absence of sufficient funds from the operation of the properties, the contract does not specify which of the parties is to pay. The only duty imposed upon plaintiff would be to minimize damages resulting from non-payment by paying the royalties to the extent of its ability to do so.

■ Defendants failed to show that the cancellation of the lease prevented them from realizing profits out of which royalties due prior to the cancellation could have been paid. However, the evidence does in fact show that the Twin Peaks' operation of the mine was unprofitable. The contract contemplated payment out of net profits. In view of the evidence that there were none, the order directing a nonsuit against defendants on the cross-complaint was proper.

■ Taking up the appeal of the plaintiff, the plaintiff contends that, quite apart from any provision of the contract requiring the defendants to pay the royalties reserved by the Flynn lease, they were as a matter of law liable for them on minerals extracted by them while in possession of the property. It also contends that, while the agreement contains no direct covenant on the part of the defendants to pay the royalties, its proper construction so requires. It further contends that on the evidence it should have been left to the jury to determine whether the defendants had failed to comply with the terms of the agreement in the matter of production from the mine; and also whether such failure was excused under subdivision B. thereof.

The defendants introduced evidence tending to show that ore taken from the Corona Mine was different in character from that produced from the Twin Peaks mine; that on account of the high sulphur content of the Corona ore they had trouble in making their furnace work; that it took two weeks to adjust the furnace so as properly to handle the Corona ore; that they had to make changes in the burner and

condenser system of their furnace and that, prior to entering into the agreement, they had had no experience in treating ore of the particular characteristics of that taken from the Corona Mine.

Defendants also introduced evidence tending to show that from the end of November, 1941, all through the winter there was almost continuous rain, making the road between the Corona and Twin Peaks mines almost impassable; one witness testified that the defendants were not able to take out 750 tons of ore because of the bad weather conditions; that the weather conditions were so bad that a truck could not get up the hill to the mine; that the road was "pretty well gummed up" most of the time. Another witness, Moody, who was accustomed to make regular deliveries of oil to both mines, testified that he went into Corona and Twin Peaks mines on November 19th, December 2d, 5th and 30th; that when he went there on December 5th the road was in bad shape and he "got stuck," that he had to do road building under his car in order to get out; that he refused to go to the mines from December 5th to 30th because the road was in bad shape; that his truck weighed 13,500 pounds loaded and 7,600 pounds net. On the subjects of the weather and the condition of the road, evidence introduced by the plaintiff tended to show that the ore had to be hauled only a mile from Corona to Twin Peaks furnace; that a witness, Tuggle, had no difficulty reaching the property in the latter part of January; that one Shrode had no difficulty in reaching the property between November 18th and January 9th; that Moody reached the property without difficulty on November 6th, 7th, 17th, 19th, December 2d, 30th, January 13th, 14th, 16th, 20th and 26th; that the only day he had trouble was on December 5th; that he demanded that defendants fix the road, and their failure to do so was the reason he made no oil deliveries between December 5th and 30th. There was also evidence tending to show that defendants actually hauled ore on days when the rainfall was greatest, and that the rainfall during the period in question, both in monthly and annual amounts, was less than in other years.

Upon the theory that the instrument was an assignment, plaintiff advances the argument that the Twin Peaks Mining Company was by operation of law liable for rents and royalties and contends that it makes no difference whether the

agreement constituted actually an assignment or a sublease —it appears that either party had the right of cancellation; that under its terms defendants became liable for rents which accrued during their possession and royalties upon minerals extracted. (*Hartman Ranch Co.* v. *Associated Oil Co.*, 10 Cal.2d 232 [73 P.2d 1163].) In the Hartman case the court was dealing with an instrument referred to as an assignment. In the present case the agreement is in the form of a sublease and is so designated, but it is in fact an agreement to work the property on a share and share basis, that is, as tenants in common. An oil lease is different from the usual usufructuary lease in commerce and trade. (*Stone* v. *City of Los Angeles*, 114 Cal.App. 192 [299 P. 838]; *Callahan* v. *Martin*, 3 Cal.2d 110 [43 P.2d 788, 101 A.L.R. 871].) The Hartman case is an oil case wherein damages and a forfeiture of the lease were prayed by reason of alleged failure to protect against "drainage." The equity plea in that action was not upheld due to failure to name the holders of the parent lease as parties to the action. Wilful drainage when so pronounced by triers of the facts may justify a liberal construction of the terms of an agreement. Nevertheless in the Hartman case the court said (p. 243): "By virtue of our decision in *Barkhaus* v. *Producers' Fruit Co.*, 192 Cal. 200 [219 P. 435], followed in *Kendis* v. *Cohn*, 90 Cal.App. 41, 48 [265 P. 844], *Backus* v. *Duffy*, 103 Cal.App. 755 [284 P. 954], and *Webb* v. *Jones*, 88 Cal.App. 20, 27 [263 P. 538], we are committed to the so-called Massachusetts rule that where the transferor reserves the right of reentry for breach of conditions he has a 'contingent reversionary interest' which prevents his transfer from operating as an assignment of the whole of the unexpired term. Instead, a sublease arises. (*Dunlap* v. *Bullard*, 131 Mass. 161, 162; *Davis* v. *Vidal*, 105 Tex. 444 [151 S.W. 290, 42 L.R.A.N.S. 1084]; *Roberson* v. *Pioneer Gas Co.*, 173 La. 313, 314 [137 So. 46, 82 A.L.R. 1264, p. 1268]; *Smith* v. *Sun Oil Co.*, 165 La. 907 [116 So. 379]; *Johnson* v. *Moody*, 168 La. 799 [123 So. 330]; *Saling* v. *Flesch*, 85 Mont. 106 [277 P. 612]. The last four citations involved oil leases.)'" An exact estimate of damage by reason of drainage is usually impossible of ascertainment. There was no provision in the instrument for the payment to plaintiff of rental except in the sense of royalties. The very nature of the mining industry ordinarily makes it necessary that royalties be paid from production and by the parties in pos-

session. The agreement herein does not include the entire property leased by its owners to T. J. Flynn, nor are its terms identical with those of such lease. When read in its entirety it is plain that the agreement provided that the property should be worked for the benefit of both parties; that plaintiff should be paid one-half of any net proceeds realized, and that if the option granted should be exercised, title to the property was to be taken in the name of the parties hereto, one-half to plaintiff and the other half to the Twin Peaks Mining Company associates. Though in the form of a sublease it is an agreement to work on shares. (40 C.J., 991, § 584.) The royalties were to be paid upon a percentage basis, and it was provided that defendants should use their best efforts to bring production to specified amounts. All necessary expenses of operation were to be met before the disbursement of funds as royalties. Mere possession of the mine did not obligate defendants to pay royalties to Flynn.

We agree with the trial court's interpretation of the contract between "Corona and Twin Peaks" that as a matter of law there was no covenant in the contract requiring the latter company to pay royalties unless they were charged to operating expenses—which in effect necessitated a net profit —and that there was no evidence of a net profit.

Another question arose, however, namely, did the defendants in good faith endeavor to develop the property in accordance with the provisions of clauses "A" and "B" of the contract. It may be that due to "breakdown of equipment, inability to obtain supplies necessary for operation," etc., defendants were unable to pay Corona an amount sufficient to enable the latter to pay the designated royalties, etc. .

Defendants introduced evidence tending to substantiate their claim that, due to weather conditions, the mine was for a long time inaccessible, and that this resulted in a total or partial discontinuance of operation. Plaintiff introduced evidence of witnesses who without difficulty actually visited the mine on certain days during the time in question. It is possible that a passenger automobile could travel the road when a truck could not. There is a conflict in the evidence, a matter that should be determined as a question of fact.

On a motion for a directed verdict "all evidence in conflict with the plaintiff's evidence must be disregarded." (*Estate of Flood,* 217 Cal. 763, 769 [21 P.2d 579]; *Estate*

*of Arnold,* 16 Cal.2d 573 [107 P.2d 25] ; *Estate of Lances,* 216 Cal. 397 [14 P.2d 768] ; *Martin* v. *Tully,* 44 Cal.App. 2d 226 [112 P.2d 282] ; *Perkins* v. *Maiden,* 57 Cal.App.2d 46 [134 P.2d 30] ; *Barton* v. *Capitol Market,* 57 Cal.App. 2d 516 [134 P.2d 847].)

The portion of the judgment in favor of defendants is reversed with directions, if plaintiff so elects, to proceed in accordance with the. views expressed herein; the portion of the judgment against defendants on the cross-complaint based upon the verdict is affirmed, each party to pay its own costs.

Peters, P. J., and Knight, J., concurred.

Petitions for a rehearing were denied May 17, 1944, and plaintiff and appellant's petition for a hearing by the Supreme Court was denied June 15, 1944. Curtis, J., and Carter, J., voted for a hearing.